[No. 15390–1–I.   Division One.   January 26, 1987.]

*In the Matter of* ANTHONY SMITH, ET AL.

DIANNA SMITH, *Appellant,* v. THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, *Respondent.*

*Paris K. Kallas* and *John R. Christiansen* of *Washington Appellate Defender Association,* for appellant.

*Kenneth O. Eikenberry, Attorney General,* and *Christine L. Currie, Assistant,* for respondent.

GROSSE, J.—Dianna Smith appeals from an order entered September 17, 1984, terminating her parental relationship with Anthony and Antoinette Smith. Dianna Smith is the natural mother of Anthony and Antoinette.

Anthony Smith was born on March 12, 1981. When Anthony was placed in shelter care on October 30, 1981, Dianna was in California. She had left Anthony with her 18-year-old sister. The residence was messy; Anthony had no diapers and was lying on a urine-soaked couch. After Dianna returned to Seattle, the caseworker made an unannounced visit to her apartment. The apartment was messy and contained garbage and litter. No toys were apparent in the apartment.

An agreed order of dependency was entered on the basis that Dianna was currently unable to provide adequate care for Anthony. Notices of the hearing were sent to the Shoshone and Gros Ventre tribes. Dianna was required to (1) establish and maintain an adequate, independent residence suitable for raising a child; (2) establish and maintain an income sufficient for raising her child from sources of social security, public assistance, food stamps, employment, or any other legitimate source; (3) attend and successfully complete a Department of Social and Health Services (DSHS) approved parenting class; and (4) undergo psychological evaluation. Dianna was granted liberal visitation of at least once a week.

From April to October 1982, Dianna began to comply with the dispositional plans. She attended 6 hours of an 8-hour parenting class and was making progress. She began mental health counseling. On September 16, 1982, Antoinette Smith was born.

From October 1982 to January 1983, Dianna's visitation with Anthony became more sporadic. Her efforts at counseling ceased when the counselor left the agency. On January 30, 1983, Antoinette was placed in shelter care.

Photographs taken of Dianna's residence showed human excrement on the floor, dirt and food littered about, and cans of spray paint. Dianna admits to a 12–year paint sniffing addiction.

On April 11, 1983, an order of dependency was entered with respect to Antoinette with conditions similar to those entered for Anthony's dependency. On August 22, 1983, visitation was reduced to twice monthly which reflected the actual visitation that Dianna had with the children from March to August.

On February 21, 1984, because the foster parents where the children had been originally placed were moving, an order was entered placing Anthony and Antoinette in foster care with relatives on the Shoshone reservation in Wyoming. The order required DSHS to provide two visitations per month. Dianna scheduled two visitations between February and the date the order of termination was entered. When Dianna appeared in Wyoming for the second visitation in August the children were not available.

Dianna assigns error to two decisions of the Superior Court. The first is to the ruling that the Indian Child Welfare Act of 1978, 25 U.S.C. § 1901 *et seq.* (ICWA), does not apply to Anthony and Antoinette. The second assignment is to the placement of Anthony and Antoinette in foster care in Wyoming.

Dianna moved for an order applying the ICWA to the termination proceedings. The State responded with two affidavits: one by the custodian of records for the Gros Ventre tribe which indicated that neither Antoinette or Anthony were eligible for membership, and another by a Bureau of Indian Affairs official that the children are 1/8 Gros Ventre, 15/64 Shoshone, and 3/32 Chippewa, and that the children did not meet enrollment criteria for Gros Ventre, Shoshone or Chippewa tribes. Dianna is 1/4 Gros Ventre, 15/32 Shoshone, and 3/16 Chippewa. She is a member of the Gros Ventre tribe. Notice of the termination proceedings was given to the Gros Ventre and Shoshone tribes and the Bureau of Indian Affairs but not to the

Chippewa tribe. In Dianna's memorandum of law in support of her motion, she admitted that the children failed to meet the statutory criteria necessary for classification as Indian children but argued that the ICWA should nevertheless be applied to the termination proceeding because the children are clearly Indian and the ICWA protects them as Indians.

■ Dianna now argues that the State's affidavits are insufficient proof of the children's ethnic origin and that the children are "Indian". Although we agree that the children can be generally described as Indian, we cannot apply the ICWA unless there is proof that the children are eligible for membership in an Indian tribe. The ICWA applies to protect an "Indian child" which is defined in 25 U.S.C. § 1903(4) as an "unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe".

> The Act is based on the fundamental assumption that it is in the Indian child's best interest that its relationship to the tribe be protected. By its enactment, Congress legislatively created a new jurisdictional framework in Indian child welfare, replacing the outmoded geographical concepts of presence or domicile with a jurisdictional standard based on the ethnic origin of the child. This standard avoids the problems of forum shopping and gives real authority to tribal courts to adjudicate child custody issues. The Act reflects Congressional recognition of the importance of child rearing to the tribe.

> The Act defines certain procedures to be followed in state court proceedings involving Indian children. These procedures protect the Indian parent or custodian from a moving party's abuse of either voluntary or involuntary placement procedures. . . .

(Footnote omitted.) *In re Appeal in Pima Cy. Juvenile Action S–903,* 130 Ariz. 202, 204, 635 P.2d 187, 189 (Ct. App. 1981), *cert. denied,* 455 U.S. 1007, 71 L. Ed. 2d 875, 102 S. Ct. 1644 (1982).

Two cases from other jurisdictions indicate the approaches that courts have taken to the eligibility deter-

mination. *In re Angus,* 60 Or. App. 546, 655 P.2d 208 (1982), *review denied,* 294 Or. 569, 660 P.2d 683, *cert. denied,* 464 U.S. 830, 78 L. Ed. 2d 109, 104 S. Ct. 107 (1983). In *Angus,* the Oregon appellate court read section 1903(4) of the ICWA to require a parent to prove that the child is a member of an Indian tribe or is merely eligible for membership in an Indian tribe and either parent is a member of an Indian tribe. Proof of the child's origin was by testimony of a custodian of records of a tribe, by a letter from an acting deputy commissioner of Indian affairs, and by testimony of the parents that the child was an enrolled member of a tribe.

> [T]he ICWA itself contains no definition of membership in an Indian tribe. In the absence of a Congressional definition, *an Indian tribe has authority to determine its own membership.* Formal membership requirements differ from tribe to tribe, as do each tribe's method of keeping track of its own membership. There is thus no one method of proof of membership, but the testimony of a representative of tribal government would be probative evidence of membership.

(Citations omitted. Italics ours.) *Angus,* at 552. *See also In re Junious M.,* 144 Cal. App. 3d 786, 193 Cal. Rptr. 40 (1983).

In *Junious M.,* the California appellate court construed the ICWA less narrowly than the Oregon appellate court. In that case, the trial court failed to give notice to the Indian tribe of the proceeding and ruled that the ICWA did not apply because neither the parents nor the child were enrolled members of the Nooksack tribe. The evidence before the court consisted of the Nooksack bylaws, evidence of blood percentages, testimony of the mother, and documentary evidence that in the opinion of the Bureau of Indian Affairs, the mother and child were eligible for membership. The California appellate court found that since the parties were eligible for membership, failure to notify the tribe of the proceeding was prejudicial error since the question of whether the minor was an Indian was one for the tribe to determine.

According to the California court, proof of eligibility for membership of the mother and child, rather than proof that the mother is an enrolled tribal member and that the child is eligible, is enough to trigger the notice provisions of the act and to allow the tribe an opportunity to enroll the mother and child.

In the instant case the record contains no evidence that Anthony and Antoinette are eligible for membership in an Indian tribe. Although these children have Indian blood percentages which, in the aggregate, are 29/64, there is no proof of eligibility which would entitle Dianna to the protections of the ICWA under either *Angus* or *Junious M.*

■■ The Bureau of Indian Affairs affidavit purports to be the statement of someone familiar with the membership requirements of the Shoshone, Gros Ventre, and Chippewa tribes. It is clearly evidence that a trial court can consider. *See In re Junious M., supra.* The Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,584–95 (1979) (hereinafter referred to as guidelines), also allow consideration of these affidavits.[1] These affidavits prove by a preponderance of the evidence that the children are not "Indian" children as defined by the ICWA. Prior to the termination hearing, the mother admitted that the two children were not eligible for membership in an Indian tribe. Dianna is bound by these admissions especially when there is no proof that the children are eligible for membership in an Indian tribe. *See A.B.M. v. M.H. & A.H.,* 651 P.2d 1170 (Alaska 1982), *cert. denied,* 461 U.S. 914, 77 L.

---

[1]Guideline B.1(a) states:

"When a state court has reason to believe a child involved in a child custody proceeding is an Indian, the court shall seek verification of the child's status from either the Bureau of Indian Affairs or the child's tribe."

Guideline B.1(b)(i) and (ii) provides:

"The determination by a tribe that a child is or is not a member of that tribe, is or is not eligible for membership in that tribe, or that the biological parent is or is not a member of that tribe is conclusive.

"Absent a contrary determination by the tribe that is alleged to be the Indian child's tribe, a determination by the Bureau of Indian Affairs that a child is or is not an Indian child is conclusive."

Ed. 2d 283, 103 S. Ct. 1893 (1983), where a party admitted that a child was an Indian child and was bound by those admissions and the application of the ICWA.

■ Even if the ICWA was to apply, the record and the trial court's findings are sufficient to satisfy the requirement of the act that the State prove beyond a reasonable doubt that the continued custody of the children by Dianna is likely to result in serious emotional or physical damage to the child; and that efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful. 25 U.S.C. § 1912(d), (f). Dianna did not assign error to the trial court's findings, therefore these become the established facts of the case. *Painting & Decorating Contractors of Am., Inc. v. Ellensburg Sch. Dist.*, 96 Wn.2d 806, 638 P.2d 1220 (1982). These findings are supported by substantial evidence and reflect Dianna's chaotic lifestyle of living with various family members; her paint sniffing addiction; her inability to maintain minimum standards of cleanliness and nourishment for her children; and her inability to accept parenting help and counseling to control her anger and poor judgment. Her own testimony reflects an unrealistic and simplistic approach to child rearing. Dianna ceased participation in parenting and counseling in the fall of 1982. At the time of trial she had made no efforts to comply with the dispositional orders which were entered 2½ years earlier.

■ The second assignment of error is the placement of Anthony and Antoinette in foster care with Dianna's relatives in Wyoming. Dianna argues that due process was violated because the distant foster care placement preceded the order terminating her parental rights and was a de facto termination of her rights without the requisite hearing. Her contention lacks merit because she was afforded a hearing at the time the placement order was entered, at the time the orders of dependency were entered, and at each review hearing. The court ordered that Antoinette and Anthony be placed with Dianna's aunt and uncle in Wyom-

ing on condition that one visitation be provided per month with DSHS to provide the transportation costs. The visitation order reflected the frequency of visitation actually exercised by Dianna in the prior 3 or 4 months. At the time of the foster care placement hearing Dianna had made no efforts to comply with the dependency orders and the caseworker had indicated an intent to file a petition for termination of parental rights.

The motions court had to reconcile two state policies in making the placement decision. RCW 13.34.130(2)(c) requires that a child be placed as close to the child's home as possible unless the court finds that placement at a greater distance is necessary to promote the child's well being. RCW 13.34.250 requires whenever appropriate an Indian child to be

placed in a foster care home with the following characteristics which shall be given preference in the following order:
(1) Relatives;
(2) An Indian family of the same tribe as the child;
(3) An Indian family of a Washington Indian tribe of a similar culture to that tribe;

The aunt and uncle were Shoshone. There were no other family members in the Seattle area who were appropriate for foster placement. Given the concern for the children's welfare, the court did not abuse its discretion in placing the children with Shoshone relatives in Wyoming.

Dianna had rights to visit the children in Wyoming. The infrequency reflects Dianna's prior lack of interest in visiting the children. The Wyoming placement was not objected to by the guardian ad litem and was clearly in the best interests of the children. It had no bearing on the eventual termination of Dianna's parental rights. Dianna's rights were terminated because of her unfitness and lack of efforts to correct her deficiencies in the nearly 3-year pendency of these proceedings. Had the State not prevailed at the termination hearing, Dianna had the right to ask for return of her children. RCW 13.34.130(3), .150. The only reason the

foster care placement gains any permanency is the later termination order which resulted from a hearing which afforded Dianna due process of law.

The orders terminating Dianna's parental rights as to Anthony and Antoinette Smith are affirmed.

SWANSON, J., concurs.

SWANSON, J. (concurring)—I concur and agree with the opinion of the court that notice to the Chippewa tribe was not necessary because the Indian Child Welfare Act of 1978 (ICWA) does not apply in the absence of proof that Anthony and Antoinette are "Indian" children as defined in the ICWA or eligible for membership in an Indian tribe and not because the children were placed with Indian relatives. Application of the notice requirements of the ICWA does not turn on the Indian or non–Indian status of the foster parents. *In re S.B.R.*, 43 Wn. App. 622, 719 P.2d 154 (1986).

WILLIAMS, J. (concurring)—Although the Indian Child Welfare Act of 1978 applies, requiring notice be given the Chippewa tribe, *In re S.B.R.*, 43 Wn. App. 622, 719 P.2d 154 (1986), I concur because placement is with relatives in the Shoshone Indian tribe. If and when placement with non–Indians is in prospect, the Chippewa tribe should be given notice of the proceedings and an opportunity to declare tribal membership of the children.

Review denied by Supreme Court March 31, 1987.