[Nos. 39312-0-I; 39313-8-I.   Division One.   October 12, 1998.]

*In the Matter of the Dependency of* E.S.

*In the Matter of the Dependency of* C.S.

THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, *Respondent*, v. PRISCILLA S., *Appellant*.

*Eric J. Nielsen* of *Nielsen, Broman & Associates, P.L.L.C.*, for appellant.

*Christine O. Gregoire, Attorney General*, and *Delores A. Peterson, Assistant*, for respondent.

KENNEDY, C.J. — Priscilla S. appeals the order terminating her parent-child relationships with her daughter, E.S., and her son, C.S., contending that the trial court erred by denying the Fort Peck Assiniboine Sioux Tribe's motion to transfer jurisdiction to the tribal court under the Indian Child Welfare Act (ICWA).[1] Because the Tribe had actual notice of the termination proceedings by no later than

---

[1] The mother's remaining contention, that the State failed to meet its burden of proving all the necessary elements to properly enter the termination order,

March 20, 1996, when its motion to intervene in the termination proceedings was granted, and did not move to transfer jurisdiction until June 4, 1996—13 days before the termination hearing was scheduled to begin—the trial court properly denied the motion as untimely. Accordingly, we affirm.

## FACTS

Priscilla S. gave birth to five children between 1988 and 1994. The children's fathers are unknown. The State appointed legal guardians for the two oldest children and allowed the youngest child to live with the mother. This appeal involves her remaining children, E.S. and C.S.

The mother has a history of drug and alcohol abuse and has resorted to criminal activity to obtain money. Twice before the commencement of termination proceedings, she entered court-ordered drug treatment programs but was unwilling or unable to successfully complete them. She describes herself as a cocaine and marijuana addict, and admits that she used drugs "off and on" during her first four pregnancies. E.S. was born with drugs in her system. Although the hospital did not detect drugs in C.S., the mother tested positive for cocaine during her pregnancy with C.S.

The State filed dependency petitions on behalf of E.S. in May 1993, and C.S. in June 1994, alleging that the mother abused or neglected these children, and that they were in danger of substantial damage to their psychological or physical development. In both petitions, the State noted that the "Indian Child Welfare Act may apply" because E.S. and C.S. "may be [Indian children] as defined in 25 U.S.C. [section] 1903(4)." Clerk's Papers at 1, 137. Without mention of the ICWA or any tribe, the trial court declared E.S. dependent by default. Regarding C.S., the court noted that

which we conclude is without merit, is treated in the unpublished portion of this opinion.

the ICWA does not apply because "the child is not enrollable." *Id.* at 155. Nonetheless, it stated that C.S.'s tribe had been notified.[2] Then, per an agreement with the mother, the court declared C.S. dependent. The State then placed E.S. and C.S. with foster families that had significant ties to the Indian community.

In August 1995, when the mother was pregnant with her fifth child, she entered an in-patient treatment program on her own initiative. In September 1995, the State—following the trial court's order—petitioned for termination of her parent-child relationships with E.S. and C.S., alleging that her failure to maintain a stable residence and her lack of a relationship with the children warranted termination. In the petition, the State noted that although the mother was an enrolled Assiniboine Sioux, the Tribe was notified and indicated that the children were not eligible for enrollment. Accordingly, the State maintained that E.S. and C.S. were "not [members] of or eligible for membership in an Indian tribe and the Indian Child Welfare Act, 25 U.S.C. § 1901 *et seq.* does not apply to the proceedings." *Id.* at 40, 182. The State did not provide a return receipt showing delivery of written notice to the Tribe when it filed the petition for termination.

On March 20, 1996, with the mother's consent, the Fort Peck Assiniboine Sioux Tribe moved to intervene in the termination proceedings, alleging that E.S. and C.S. were Indian Children under 25 U.S.C. section 1903(4), who were

---

[2]The record contains two notices, which are dated June 9, 1994, and August 16, 1994, that dependency proceedings had commenced regarding C.S. The notices were addressed to the Assiniboine Sioux Tribe of Montana. There are no return receipts. The agreed dispositional order in C.S.'s dependency proceedings states: "The child's tribe has been notified of this proceeding by registered mail received at least 15 days prior to the hearing." Clerk's Papers at 255. It also contains the following language: "A PETITION FOR PERMANENT TERMINATION OF THIS PARENT-CHILD RELATIONSHIP MAY BE FILED IF THE CHILD IS PLACED OUT OF THE HOME PURSUANT TO AN ORDER OF DEPENDENCY." *Id.* at 261. The same document contains handwritten language averring as follows: "Per phone contact with tribal attorney Gary Beaudry the child is not enrollable." *Id.* at 255.

eligible for membership in the Tribe.[3] The trial court granted this motion. Three months later, on June 4, 1996, the Tribe moved, under the ICWA, to transfer jurisdiction over the termination proceedings to the Fort Peck Tribal Court in Poplar, Montana. By this time, the termination hearing was scheduled to begin in 13 days. Although the trial court acknowledged that the "children are now enrolled members of the Tribe, each being 7/32 Indian," it denied the motion to transfer because it was "too late." *Id.* at 81.

At the time of the termination hearing, which actually commenced in August 1996, the mother had been "clean and sober" for one year. Nonetheless, after three and one-half days of testimony, the trial court found that continued custody with the mother would cause the children serious emotional or physical damage. It concluded that the State had established beyond a reasonable doubt the ICWA requirements for termination,[4] as well as the state law requirements.[5] Accordingly, it terminated the mother's parent-child relationships with E.S. and C.S. The mother appeals.

## DISCUSSION
### The Tribe's Motion To Transfer Jurisdiction

■ Congress enacted the ICWA to prevent states from placing Indian children in non-Indian homes, thereby

---

[3]A tribe has authority to determine its own membership. *In re Dependency of Smith*, 46 Wn. App. 647, 651, 731 P.2d 1149 (1987).

[4]Under the ICWA, 25 U.S.C.A. § 1912(f) (1983), the State must prove beyond a reasonable doubt that "custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child." In addition, there is a preference for permanent placement with Indian families. FELIX S. COHEN, COHEN'S HANDBOOK OF FEDERAL INDIAN LAW 196, 348 n.4 (1982).

[5]To terminate parental rights under RCW 13.34.180, the State must prove by clear, cogent, and convincing evidence that the child has been found to be dependent; the court has entered a dispositional order; the child has been removed from the custody of the parent for a period of at least six months; the services ordered have been offered or provided and are reasonably available and capable of correcting the parental deficiencies; there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future; and continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

preserving the cultural, social, and economic factors of tribal sovereignty. *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 30, 109 S. Ct. 1597, 104 L. Ed. 2d 29 (1989); *In re Adoption of Crews*, 118 Wn.2d 561, 567-69, 825 P.2d 305 (1992). The ICWA does not divest state courts of their jurisdiction over children of Indian descent who live off the reservation. Instead, it provides concurrent jurisdiction to state and tribal courts with a preference for tribal courts that can be overcome upon a showing of good cause:

> In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe[.]

25 U.S.C.A. § 1911(b) (1983); *Crews*, 118 Wn.2d at 568.

█ The burden of establishing good cause by clear and convincing evidence is on the party opposing the transfer. *People ex rel. A.T.W.S.*, 899 P.2d 223, 225 (Colo. Ct. App. 1994); *In re M.E.M.*, 195 Mont. 329, 635 P.2d 1313 (1981). By its nature, this determination is subjective and requires a balancing of the State's, the child's, and the Tribe's rights. *Yavapai-Apache Tribe v. Mejia*, 906 S.W.2d 152, 163 (Tex. Ct. App. 1995). The ultimate determination of good cause is within the discretion of the trial court. *A.T.W.S.*, 899 P.2d at 225; *Mejia*, 906 S.W.2d at 163. Conflicting evidence is viewed in the light most favorable to the prevailing party below. *Washington Belt & Drive Sys., Inc. v. Active Erectors*, 54 Wn. App. 612, 616, 774 P.2d 1250 (1989). This court will overturn the trial court's ruling only if there is an abuse of discretion, i.e., if it is manifestly unreasonable or based upon untenable grounds for untenable reasons. *Coggle v. Snow*, 56 Wn. App. 499, 504, 784 P.2d 554 (1990).

█ █ Here, the Tribe moved to transfer jurisdiction to the Tribal Court and the State opposed transfer because

the motion was untimely.[6] The Bureau of Indian Affairs' interpretation of the ICWA provides that "[g]ood cause not to transfer the proceeding [to tribal court] may exist if . . . [t]he proceeding was at an advanced stage when the petition to transfer was received and the petitioner did not file the petition promptly after receiving notice of the hearing." Guidelines for the State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,584, 67,591 (Dep't of the Interior, BIA 1979) (BIA GUIDELINES). Relying upon these guidelines, the trial court determined that the proceeding in the present case was at an advanced stage when the motion to transfer was received and that it was not filed promptly after the Tribe received notice of the hearing. It therefore concluded that good cause existed to oppose the transfer and it denied the motion.

The BIA guidelines have no binding legislative effect, but "the construction of a statute by the executive department charged with its administration is entitled to great weight." *In re Junious M.*, 144 Cal. App. 3d 786, 793 n.7, 193 Cal. Rptr. 40, 43 n.7 (1983); *accord Mejia*, 906 S.W.2d at 164 ("Guidelines should be given important significance."). The legislative history of the ICWA indicates that the reason the phrase, "good cause to the contrary" is not defined is to provide state courts with flexibility in determining the disposition of a child custody proceeding involving an Indian child. *See Mejia*, 906 S.W.2d at 164 (citing H.R. REP. No. 95-1386, at 21 (1977), *reprinted in* 1978 U.S.C.C.A.N. 7530, 7544).

I. Were the Proceedings at an Advanced Stage?

The Tribe filed its motion to transfer on June 4, 1996, that is, nine months after the State petitioned the trial court for termination, three months after the Tribe received actual notice of the termination proceedings, and

---

[6]The State also opposed the Tribe's motion because the evidence necessary to decide the case could not be adequately presented in the Montana tribal court without undue hardship to the parties or witnesses. In response, the Tribe informed the court that the termination proceedings would be dropped if the case was transferred to the tribal court. Accordingly, the trial court concluded that hardship did not provide good cause to deny the transfer.

13 days before the termination hearing was scheduled to begin. We therefore conclude that the trial court did not abuse its discretion in concluding that this proceeding was at an advanced stage when it received the motion to transfer.

II. When did the Tribe Receive Notice?

██ ██ "The ICWA requires that in any involuntary child custody proceeding involving an Indian child, the State shall notify the parents and the Indian child's tribe, by registered mail with return receipt, of the pending proceedings and the tribe's right to intervene." *In re Welfare of M.S.S.*, 86 Wn. App. 127, 133, 936 P.2d 36, *review denied*, 133 Wn.2d 1008 (1997), *cert. denied sub nom. Sather v. Washington*, 528 U.S. 1098, 118 S. Ct. 1564 (1998); 25 U.S.C.A. § 1912 (1983); RCW 13.34.070(9). This court has held that strict technical compliance with the notice provision is not an absolute requirement; substantial compliance is sufficient. *M.S.S.*, 86 Wn. App. at 134-35 (finding substantial compliance when notice was received via overnight mail). "The statute and the case law, however, have all required actual notice to the tribe of both the proceeding and the right to intervene." *Id.* at 135 (citing *In re Kahlen W.*, 233 Cal. App. 3d 1414, 285 Cal. Rptr. 507, 511 (1991)). The State has the burden of proving that the notices sent complied with the ICWA. *Id.* at 136 (citing *In re N.A.H.*, 418 N.W.2d 310, 311 (S.D. 1988); *In re L.A.M.*, 727 P.2d 1057, 1060-61 (Alaska 1986)). "Failure to provide the required notice mandates remand unless the tribe has participated in the proceedings or expressly indicated that it has no interest in the proceedings." *M.S.S.* at 134 (citing *Kahlen W.*, 285 Cal. Rptr. at 513).

██ "Indian child" is defined as any unmarried person who is under age 18 and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe. 25 U.S.C.A. § 1903(4) (1983). The BIA guidelines explain, "The determination by a tribe that a child is or is not a member of that tribe, is or is not eligible for membership

in that tribe, or that the biological parent is or is not a member of that tribe is conclusive." BIA GUIDELINES, 44 Fed. Reg. at 67,586; *In re Dependency of Smith*, 46 Wn. App. 647, 651, 731 P.2d 1149 (1987). Although a tribe's declaration that a child is or is not a member is conclusive, it may nevertheless change its determination of a child's status. That is, it may determine at a point in time that a given child is not enrollable and later change its mind and determine that the child is enrollable. The BIA guidelines explain that "[i]t is the tribe's prerogative to determine membership criteria and to decide who meets those criteria." BIA GUIDELINES, 44 Fed. Reg. at 67,586.[7]

■ A "termination hearing, for the purposes of notice and appearance requirements, is a proceeding separate from any dependency proceedings[.]" *In re Dependency of C.R.B.*, 62 Wn. App. 608, 619, 814 P.2d 1197 (1991). "The court's failure to satisfy the statutory requirements [in termination proceedings] may not be corrected by relying on evidence presented at the dependency hearings." *Id.*

■ Judge Ramerman found that "the Tribe, in fact, had notice of the pendency of the dependency proceedings in 1994, and of the progress of the dependencies since." Clerk's Papers at 84. Although the evidence in support of this finding is conflicting, the finding is nevertheless sustainable because it is supported by substantial evidence in the record. The court had before it two notices, which the State alleged were sent to the Tribe in 1994, stating that dependency proceedings had commenced regarding C.S. The record contains these notices, which were addressed to the Assiniboine Sioux Tribe of Montana, but it contains no return receipts or other documentation to prove that the Tribe received them. The court also considered the dispositional order in C.S.'s dependency proceedings—which was signed by the trial court, the mother, her attorney, the State's social worker, and the attorney for the

---

[7]The record is silent regarding whether the Tribe changed its membership requirements during the proceedings involving E.S. and C.S. It is also silent regarding when E.S. and C.S. became enrolled members of the Tribe. The document verifying their enrollment is dated June 5, 1996. Clerk's Papers at 313.

State—that asserts that the Tribe was properly notified of the proceedings.[8]

The court also considered the declaration of Barbara Jones, the Area Manager for the Division of Children and Family Services, which states that, although they received no written response from the Tribe, they consistently sent all documents regarding the dependency and termination proceedings to the Tribe. In contrast, the court had before it an affidavit from Gary Beaudry, the Tribe's attorney, stating, "I would not admit that the Fort Peck Tribes received proper Notice in the foster care placement proceedings in these matters." *Id.* at 284.

On March 20, 1996, the Tribe intervened in the termination proceedings. At that time, the State was aware that the children were, in fact, enrollable and that they were being enrolled in the Tribe. Accordingly, the State contends that it again sent notice of the termination proceedings to the Tribe, on May 6, 1996. Although the record contains no copy of what was actually sent, it does contain return receipts from the Tribe and Beaudry, indicating that they each received a registered mailing from the Attorney General's Office.

■ We strongly urge the State to train its case workers who deal with Indian children to meticulously follow the BIA notice requirements and to document the court files so that the trial and appellate courts can easily determine what notices were sent by means of corresponding return receipts. We point out that the BIA guidelines require that originals or copies of each notice sent under the Act be filed with the court together with return receipts or other proof of service. BIA GUIDELINES, 44 Fed. Reg. at 67,588. We highly recommend that this be done with respect to all such notices. We emphasize that the burden of proving notice is on the State. *M.S.S.*, 86 Wn. App. at 136. Following the BIA guidelines regarding filing of proof of service in the trial court's file would be the most efficient way of meeting that burden of proof.

---

[8]This order was not appealed by the mother or the Tribe.

██ Although that was not done here, the Tribe had actual notice of the termination proceedings no later than March 20, 1996, when it intervened. The State may not rely upon evidence presented at the dependency proceedings to satisfy termination proceedings requirements. *C.R.B.*, 62 Wn. App. at 619. But, flaws in notice of the dependency proceedings do not in and of themselves abort subsequent termination proceedings if there has been actual notice of the termination proceedings. Therefore, the State's failure to document that it provided proper notice of the dependency proceedings is not fatal to the termination proceedings. Because substantial evidence supports the trial court's determination that the Tribe, in this particular case, received actual notice of the termination proceedings, as demonstrated by its intervention in those proceedings, we will not disturb this finding.[9] *See M.S.S.*, 86 Wn. App. at 134 (explaining that failure to provide required notice mandates remand unless tribe has participated in proceedings or expressly indicated it has no interest in proceedings).

III. Was the Motion Filed Promptly after the Tribe Received Notice?

██ The final issue is whether the petition to transfer jurisdiction, which was filed June 4, 1996, was filed promptly after the Tribe received actual notice of the proceedings. Neither the ICWA nor the BIA guidelines specify a time when a motion to transfer is "promptly" filed. The BIA guidelines note, "Permitting late transfer requests by persons and tribes who were notified late may cause some disruption. It will also, however, provide an

---

[9]At the termination hearing, the mother's attorney revisited this issue to make a record to preserve the objection for appeal. But the trial court, Judge Marsha Pechman, clarified, "[T]he issue of jurisdiction has already been decided. Presumably everything that needs to be in the record for the purpose of making that decision is already there. I don't have any basis for redetermining that issue. It's not a decision that I am going to make again. It's already been made." Report of Proceedings at 9. The testimony presented merely corroborated the affidavits and documents that were before Judge Ramerman. At the conclusion of the hearing, Judge Pechman also found that the Tribe was sent notice of the termination proceedings with respect to C.S. in 1994.

incentive to the [State] to make a diligent effort to give notice promptly in order to avoid such disruptions." BIA GUIDELINES, 44 Fed. Reg. at 67,590.

The Supreme Court of South Dakota addressed this issue in *People ex rel. J.J.*, 454 N.W.2d 317 (S.D. 1990). Even though the tribe in that case was not at fault for the untimeliness of its transfer motion, the trial court denied its motion to transfer, explaining, "In this instance, it appears to us that honoring the late request for transfer will wreak havoc, rather than merely disrupt; all of which far outweighs any sanction against [the State] for not having made a more diligent effort to give notice." *Id.* at 331.

Here, although the Tribe received notice of the dependency proceedings in 1994 and became a participant in the termination proceedings by means of intervention in March 1996, it did not move to transfer jurisdiction until June 1996. In Beaudry's affidavit, which Judge Ramerman considered, Beaudry stated that it was not unusual for the Tribe to file a motion to transfer on the heels of termination petitions because it is the Tribe's policy to protect its members from termination of parental rights. Accordingly, he averred, "It is reasonable and logical that the Fort Peck Tribes only files a motion to transfer jurisdiction when a matter goes beyond foster care placement." Clerk's Papers at 285. Yet, Beaudry failed to explain why the Tribe—having actual notice no later than March 20, 1996—waited until June 1996 to file its motion to transfer.

When the Tribe moved to transfer jurisdiction, E.S. and C.S. had been in the system since shortly after birth—nearly four and two years, respectively. Further delays would have caused great disruption to the children. *See J.J.*, 454 N.W.2d at 330 (considering the fact that children had been in the system for over five years to determine whether motion to transfer was filed promptly). Despite the Tribe's stated policy of waiting until the eve of termination to seek transfer, in Washington, our Legislature and our courts have declared that children have a right to the speedy resolution of termination proceedings. RCW

13.34.020; *In re Dependency of J.W.*, 90 Wn. App. 417, 427, 953 P.2d 104 (1998). Our Legislature has also developed a statutory scheme of making every effort to reunite families before resorting to termination. RCW 13.34.020. Therefore, children are likely to be in great need of permanent planning by the time of termination proceedings.

In Washington termination proceedings, the court must also determine that termination is in the best interest of the child. *In re Dependency of Ramquist*, 52 Wn. App. 854, 863, 765 P.2d 30 (1988). When a conflict arises between competing interests, the court should focus on the best interests of the child. *In re Dependency of A.V.D.*, 62 Wn. App. 562, 574, 815 P.2d 277 (1991). Although the ICWA provides that a tribe should determine the best interests of its own members, thus avoiding the trap of cultural biases, the BIA Guidelines nonetheless give state courts discretion to deny motions that come too late. BIA GUIDELINES, 44 Fed. Reg. at 67,591. This implies that the best interest of the child is a factor when considering the motion at a late stage in the proceedings—after actual notice to the Tribe—where granting of the motion would clearly wreak havoc in the lives of the children.

We emphasize that in a situation such as this where a tribe has notice of dependency proceedings and is kept abreast of how things are going, that tribe may properly be found to have moved for transfer too late on the eve of the termination hearing. Moreover, the Tribe here waited from March 1996 when it intervened until June 1996 before it moved to transfer jurisdiction. Three months is a long time for a young child in need of permanent planning to wait. For these reasons, we conclude that the Tribe's motion to transfer was not filed promptly after it received actual notice and intervened in the termination proceedings.

In sum, the trial court did not abuse its discretion in denying the motion to transfer jurisdiction, despite the deficiencies in the State's documentation that it provided timely notice to the Tribe, because—by whatever means—the Tribe did receive actual notice of the termination

proceedings by no later than March 1996 when it intervened in the proceedings and the Tribe did not thereafter "promptly" move to transfer jurisdiction. Moreover, the proceedings complied with the ICWA's substantive standards, *e.g.*, adopting a higher standard of proof for termination and a preference for Indians as adoptive parents, and permitting the Tribe to intervene when it sought to do so. Thus, the state court proceedings were in accord with the policies behind the ICWA. *See* FELIX S. COHEN, COHEN'S HANDBOOK OF FEDERAL INDIAN LAW, 196, 348 n.4 (1982). The record also reflects that the trial court balanced the rights of the State, the child, and the Tribe, in making its ruling. *See* Clerk's Papers at 21 ("This court finds that the current resources for the children are appropriate, meet the intent of the ICWA, and will actively assist the children in maintaining tribal ties.").

In sum, we affirm the trial court's denial of the Tribe's motion to transfer jurisdiction from state court to the tribal court.

A majority of the panel having determined that the remainder of this opinion lacks precedential value and will not be printed in the Washington Appellate Reports but will be filed for public record in accord with RCW 2.06.040, it is so ordered.

WEBSTER and BECKER, JJ., concur.