

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In re Dependency of | ) | No. 40426-9-III |
| | ) | |
| | ) | |
| S.S.B. [†] | ) | |
| | ) | |
| | ) | UNPUBLISHED OPINION |

COONEY, J. — C.B. and J.G. are the biological parents of S.S.B. S.S.B.'s mother,

C.B., is a member of the Chippewa Cree Tribe of Rocky Boy's Indian Reservation

(Chippewa Cree). S.S.B.'s father, J.G., has no verifiable American Indian heritage.

After three years of dependency proceedings, the Department of Children, Youth, and

Families (Department) filed a petition to terminate the parent-child relationship between

---

[†] To protect the privacy interests of S.S.B., we use her initials throughout this
opinion. Gen. Order for Court of Appeals, *In re Changes to Case Title* (Wash. Ct. App.
Aug. 22, 2018) (effective September 1, 2018),
http://www.courts.wa.gov/appellate_trial_courts.

S.S.B. and both of her parents. The Department's petition was granted following a bench trial.[1]

On appeal, J.G. argues the Department failed to provide adequate notice to Chippewa Cree and did not make active efforts to provide him with remedial services and rehabilitative programs. The Department and S.S.B. respond that Chippewa Cree was given proper notice under the Indian Child Welfare Act (ICWA), 25 U.S.C. §§ 1901-1963, and the Washington Indian Child Welfare Act (WICWA), chapter 13.38 RCW, and substantial evidence supports the trial court's findings regarding the Department's active efforts to prevent the breakup of S.S.B.'s American Indian family. We agree with the Department and S.S.B. and affirm.

## BACKGROUND

S.S.B. was born in February 2011 to C.B. and J.G. J.G. was imprisoned in 2012 for second degree assault (domestic violence) and unlawful possession of a firearm. Ex. 20, 24 at 1. J.G. was released to unstable living arrangements in 2019. At various times relevant to this appeal, J.G. resided with his wife,[2] lived with his mother, rented his own apartment, and was sometimes unhoused. J.G. returned to prison in June 2020 for ingesting controlled substances in violation of the terms of his community custody.

---

[1] The trial court entered an order of default against C.B. after she failed to appear in court on January 8, 2024.

[2] His wife at the time was not C.B.

The Department became involved with the family in September 2020 following a report to Child Protective Services (CPS) that C.B. had left S.S.B., who at the time was nine years old, alone at a gasoline station. Ex. 1 at 4. In late January 2021, C.B. again left S.S.B. unattended, this time at a shelter. Ex. 1 at 3. C.B requested S.S.B. be placed in foster care and told S.S.B. that she could no longer care for her. Ex. 1 at 3.

On January 27, 2021, S.S.B. was removed from C.B.'s care. Ex. 3. The Department filed a dependency petition the following day, alleging that C.B. posed a substantial risk of neglecting S.S.B. due to her "ongoing and unaddressed substance use and mental health" issues. Ex. 1 at 3. C.B. informed the Department that she was an enrolled member of Chippewa Cree and that S.S.B. was not eligible for enrollment. Based on C.B.'s representation, the Department sent a "Native American Inquiry Request" to Chippewa Cree via certified mail with return receipt requested. Ex. 3 at 3.

On February 24, 2021, the Department filed an amended dependency petition, claiming that J.G. was incarcerated at the Airway Heights Corrections Center. The petition stated that collateral sources showed J.G. had nine felony convictions, pending criminal charges, and had been arrested for a probation violation on February 3, 2021. Ex. 2 at 1-2. J.G. had married Denise Johnson prior to his arrest on February 3.

J.G. was released from the Airway Heights Corrections Center in March 2021, only to return to jail in April. In April 2021, while J.G. was detained at the Spokane County Jail, two social workers, one of who was a Family Assessment Response (FAR)

social worker, met J.G. for a "face-to-face in person" meeting. Rep. of Proc. (RP) at 270. The social workers scheduled J.G. for a neuropsychological evaluation with a uniquely qualified physician and referrals were made for him to obtain a domestic violence assessment and urinalysis testing. Shortly thereafter, J.G. was released from jail and resided with his wife. J.G. subsequently "dropped out of communication" and failed to appear for the neuropsychological evaluation, did not submit to urinalysis testing, and failed to follow through on the referral for the domestic violence assessment. RP at 280.

Between late April and the end of May 2021, J.G. had minimal contact with the Department through telephone calls and text messages. Thereafter, J.G.'s telephone did not work, and he was no longer residing consistently with his wife. The social worker tried to locate J.G. through phone calls; text messages; service letters; social media platforms; searching government databases; checking jail rosters; monitoring court websites; and contacting his wife, parents, and community corrections officer. A second social worker made similar attempts.

The Department discovered J.G. was once again incarcerated in May 2022. During this period, Ms. Johnson filed a petition for a domestic violence protection order against J.G. Ex. 26. J.G. was eventually released from jail and spent the latter half of 2022 living in an apartment in Spokane, Washington, until his eviction at the end of the year.

In mid-January 2023, J.G. briefly moved to Kalispell, Montana, where he lived out of his car. During this time—late 2022 to early 2023—the Department attempted to locate J.G. through telephone calls; text messages; service letters; searching government databases; requesting police reports; monitoring jail rosters; checking court websites; contacting his wife, his father, his wife's social worker, and his community corrections officer; inquiring into an Adult Protective Services matter that involved his wife; using the "parent locator;" searching local shelters; and attending one of his criminal court dates. RP at 393.

In February 2023, J.G. was arrested in Montana on a warrant issued after he left Washington without permission. In March or April 2023, J.G. resided in an apartment above the Red Lion in Spokane, until he was arrested in July for first degree unlawful possession of a firearm. Ex. 25. A social worker contacted J.G. in jail and scheduled a substance abuse evaluation. J.G. submitted to the substance abuse evaluation while incarcerated. The evaluation resulted in a recommendation that J.G. complete inpatient treatment.

J.G. was released from jail on bond in late August, and discontinued having contact with the Department. A social worker attempted to locate J.G. through, among other means, the "parent locator;" searching government databases; communicating with his wife, his father, and his aunt; searching local shelters; and attending one of his criminal court dates. RP at 103-04, 129.

5

J.G. was incarcerated again in December 2023. J.G. successfully completed a parenting class while confined at the Geiger Correction Center. J.G. remained incarcerated through the time of trial.

The social workers found it easy to contact J.G. when he was incarcerated. Upon his release from jail, J.G. "was good about texting and was great to work with." RP at 271. However, J.G. "pretty quickly, would fall off and [they] wouldn't be able to find him again." RP at 271.

The Department filed a petition to terminate the parent-child relationship between S.S.B. and her parents on December 30, 2022. The Department sent notice to several tribes, including Chippewa Cree, by certified mail with return receipt requested. The notice was in substantially the same form as the Washington Indian Child Welfare Act Notice form WPF JU 03.0900 and listed a termination hearing of April 6, 2023. A representative of Chippewa Cree signed the return receipt on March 13, 2023, acknowledging the tribe had received the WICWA notice form.

In response to the notice, Chippewa Cree claimed S.S.B. was not eligible for membership. Ex. 10 at 2. Chippewa Cree later modified its membership eligibility requirements. On November 1, 2023, Chippewa Cree informed the Department that S.S.B. was eligible for membership and that it would be intervening in the case. The November 6 trial date was continued to January 29, 2024, to allow additional time for Chippewa Cree to intervene. Ex. 31. Chippewa Cree then reversed course and notified

the Department that the "tribe will not be intervening" "due to the late correspondence and involvement we do not have adequate time to prepare any response." Ex. 31.

The termination trial commenced on March 4, 2024. J.G. appeared with his attorney. S.S.B. was represented by an attorney who advocated for termination of J.G. and C.B.'s parental rights, and C.B. had earlier been found in default. At trial, Chippewa Cree representative Jaynah Gopher acknowledged she was informed of the trial date through an e-mail sent on February 7, 2024. Ms. Gopher testified Chippewa Cree agreed with the conclusion in Richard England's report that J.G.'s custody of S.S.B. would likely result in emotional and physical damage, and that S.S.B. was in an appropriate placement. Ms. Gopher testified she had sufficient opportunity to speak with her supervisor and Chippewa Cree's council to present the decision and recommendation.

The court issued its findings of fact and conclusions of law after a four-day trial. The court found the Department offered J.G. a chemical dependency assessment with follow up treatment, urinalysis testing, a mental health assessment and follow up treatment, a neuropsychological evaluation and recommended treatment, an evidence-based parenting program, and a domestic violence assessment and treatment. J.G. initially did not believe he needed to engage in the dependency because he thought someone else would "step up to the plate" and provide a home for S.S.B. The trial court noted J.G.'s criminal history and his difficulty following through with the terms of his community custody.

The trial court found the Department's active efforts were ineffective because J.G. fell out of contact with social workers when he was not incarcerated and failed to attend scheduled appointments. The trial court found that J.G. was not resistant to services, was aware of his mental health and chemical dependency issues, and acknowledged the need for treatment. Even in light of J.G. admitting that steps were taken and services provided to get him where he needed to be, he lacked the follow-through necessary to remedy his parental deficiencies.

The trial court found that J.G. had only one visit with S.S.B. during the three years of the dependency. The court further found J.G.'s contact and relationship with S.S.B. was nonexistent and concluded there was little likelihood J.G.'s situation would be remedied in the near future. The court granted the Department's petition and termination of the parent-child relationship between S.S.B. and both parents.

J.G. timely appeals.

## ANALYSIS

### ADEQUACY OF NOTICE TO THE CHIPPEWA CREE TRIBE

J.G. argues he was denied his right to due process when the Department failed to properly notify Chippewa Cree of the proceedings. We disagree.

Applicability of the ICWA is a question of law that this court reviews de novo. *In re Custody of C.C.M.*, 149 Wn. App. 184, 194, 202 P.3d 971 (2009). Factual findings of the trial court are upheld if supported by substantial evidence from which a rational trier

8

of fact could find the necessary facts by "clear, cogent, and convincing evidence." *In re Dependency of K.S.C.*, 137 Wn.2d 918, 925, 976 P.2d 113 (1999). Unchallenged findings of fact are treated as verities on appeal. *In the Interest of Mahaney*, 146 Wn.2d 878, 895, 51 P.3d 776 (2002).

The Department bears the burden of demonstrating that it substantially complied with ICWA's notice requirements. *In re Welfare of M.S.S.*, 86 Wn. App. 127, 136, 936 P.2d 36 (1997); *In re Dependency of E.S.*, 92 Wn. App. 762, 771, 964 P.2d 404 (1998). We review the record for substantial evidence that notice requirements were met. *E.S.*, 92 Wn. App. at 772. Failure to provide proper notice under ICWA requires remand unless the tribe participated in the proceedings or expressly responded that it has no interest in the proceedings. *Id.* at 771.

Questions of statutory interpretation are questions of law reviewed de novo. *State v. Ervin*, 169 Wn.2d 815, 820, 239 P.3d 354 (2010). "The purpose of statutory interpretation is 'to determine and give effect to the intent of the legislature.'" *State v. Evans*, 177 Wn.2d 186, 192, 298 P.3d 724 (2013) (quoting *State v. Sweany*, 174 Wn.2d 909, 914, 281 P.3d 305 (2012)). "When possible, we derive legislative intent solely from the plain language enacted by the legislature, considering the text of the provision in question, the context of the statute in which the provision is found, related provisions, and the statutory scheme as a whole." *Id.* If the plain language of a statute is subject to

more than one reasonable interpretation, the statute is ambiguous, and we engage in statutory construction. *Id.* at 192-93.

Washington adopted significant provisions of the ICWA into the WICWA. We therefore read the two statutes as coextensive except when differences exist in the statutory language. *In re Adoption of T.A.W.*, 186 Wn.2d 828, 844, 383 P.3d 492 (2016). Hence, "the acts [are] interpreted analogous and conterminous" yielding only to one version if it provides more protection to a covered party. *Id.*

J.G. argues the Department failed to provide proper notice to Chippewa Cree. He claims the Department was required to provide Chippewa Cree notice of every hearing by registered mail and that e-mail notifications fail to satisfy the ICWA's notice requirement. We disagree.

The notice requirement under the ICWA provides:

**Notice; time for commencement of proceedings; additional time for preparation**

In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking . . . termination of parental rights to, an Indian child shall notify the… Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention… No . . . termination of parental rights proceeding shall be held until at least ten days after receipt of notice by . . . the tribe. . . . *Provided*, That . . . the tribe shall, upon request, be granted up to twenty additional days to prepare for such proceeding.

25 U.S.C. § 1912(a) (emphasis in original). 25 CFR § 23.111(c) clarifies that "[n]otice must be sent by registered or certified mail with return receipt requested." WICWA's notice provision reads:

> In any involuntary child custody proceeding seeking . . . the termination of parental rights to, a child in which the petitioning party or the court knows, or has reason to know, that the child is or may be an Indian child as defined in this chapter, the petitioning party shall notify . . . the Indian child's tribe or tribes, by certified mail, return receipt requested, and *by use of a mandatory Indian child welfare act notice* addressed to the tribal agent designated by the Indian child's tribe or tribes for receipt of Indian child welfare act notice, as published by the bureau of Indian affairs in the federal register. . . . No . . . termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the . . . Indian . . . tribe. The . . . tribe shall, upon request, be granted up to twenty additional days to prepare for the proceeding.

RCW 13.38.070(1) (emphasis added).

Here, the Department's notice to Chippewa Cree was in substantially the same form as the Washington Indian Child Welfare Act Notice form.[3] The notice was mailed to Chippewa Cree on March 7, 2023, by certified mail with return receipt requested. A Chippewa Cree representative signed the return receipt, acknowledging that Chippewa Cree acquired the notice on March 13, 2023. The notice sent by the Department to Chippewa Cree fulfilled the requirements of the ICWA and the WICWA.

---

[3] Form WPF JU 03.0900, Indian Child Welfare Act Notice, https://www.courts.wa.gov/forms/documents/JU03_090_ICWA%20Notice%202023%2008.pdf

J.G. next asserts the Department was required to provide notice of every hearing by registered mail. We disagree.

The ICWA notice requirements are codified in 25 U.S.C. § 1912(a). Supporting regulations pertaining to notice are addressed in 25 C.F.R. § 23.111(d). The enforcing regulation does not require notice to be given for each hearing. The Bureau of Indian Affairs published a comment on notice that clarifies:

> Each proceeding may involve more than one court hearing, but only one notice meeting the registered (or certified) mail requirements of section 1912(a) is required for each proceeding (regardless of the number of court hearings within the proceeding).

Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38810 (June 14, 2016).

The Department notified Chippewa Cree of the original April 6, 2023, termination trial by certified mail. Thereafter, the Department kept Chippewa Cree apprised of hearing dates through e-mail communications. Ex. 31. The Department complied substantially with the notice requirements of 25 U.S.C. § 1912(a) and RCW 13.38.070(1). Moreover, any purported defect in notice was cured by Chippewa Cree's participation in the trial through Ms. Gopher. *E.S.*, 92 Wn. App. at 771.

The Department satisfied the notice requirements under both the ICWA and the WICWA.

ACTIVE EFFORTS

J.G. argues the Department did not make active efforts to provide him remedial services and rehabilitative programs designed to prevent the breakup of his American Indian family. The Department responds that it made active efforts, but was unsuccessful because J.G. would consistently flee and make himself unavailable after being released from custody. S.S.B. argues that substantial evidence supports the trial court's finding that the Department made active efforts. We agree with the Department and S.S.B.

"Active efforts" is defined as "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family." 25 C.F.R. § 23.2. Active efforts must be "tailored to the facts and circumstances of the case" and be provided to the parent in a timely and diligent manner. 25 C.F.R. § 23.2; RCW 13.38.040(1)(a). This requires the Department do more than merely make referrals for services. The Department must work with the parent to "overcome barriers" to the provision of services. 25 C.F.R. § 23.2(2); *see In re Dependency of R.D.*, 27 Wn. App. 2d 219, 233-34, 532 P.3d 201 (2023). If the Department is unable to provide "optimum services" or the services do not exist or are unavailable, the Department must consider "alternative ways to address the needs of the Indian child's parents and, where appropriate, the family." 25 C.F.R. § 23.2(10). The Department must "meaningfully engage" with a parent to address their needs. *In re Dependency of G.J.A.*, 197 Wn.2d 868, 895, 489 P.3d 631 (2021).

13

Whether the State met the active efforts requirement is a mixed question of law and fact. *In re Dependency of A.L.K.*, 196 Wn.2d 686, 697, 478 P.3d 63 (2020). "We review the underlying findings for substantial evidence, but review de novo whether those findings satisfy the requirements of ICWA" and WICWA. *In re Parental Rights to D.J.S.*, 12 Wn. App. 2d 1, 37, 456 P.3d 820 (2020), *abrogated by G.J.A.*, 197 Wn.2d at 901 n.16, 906 n.17.

J.G. contends the Department did not make active efforts because it failed to provide him with a telephone, housing, transportation, and a parent navigator. We disagree. Substantial evidence supports the trial court's finding that the barrier to J.G.'s reunification with S.S.B. was his intentional disassociation from the Department as he generally had a telephone or access to a telephone, his own means of transportation or Department provided bus passes, and various forms of housing. Further, a parent navigator would not have been more successful than a social worker in locating J.G. or assisting him with access to services.

The barriers to J.G.'s reunification with S.S.B. consisted of unaddressed substance abuse and mental health issues. To overcome these barriers, the court ordered J.G. to undergo a chemical dependency assessment, urinalysis testing, a mental health assessment and follow up treatment, a neuropsychological evaluation and recommended treatment, an evidence-based parenting program, and a domestic violence assessment and treatment.

14

Throughout the term of the dependency, J.G. purposefully impeded the Department's attempts at providing these remedial services and rehabilitative programs by making himself unavailable. Contrary to J.G.'s assertion, his inaccessibility was not based on a lack of a telephone, transportation, or housing. J.G. conceded that he either had a telephone or was able to borrow a telephone if needed. As for transportation, J.G. periodically had a vehicle, could walk to service providers, or had the benefit of Department issued bus passes. Concerning his homelessness claim, although J.G. had periods of being unhoused, he otherwise resided with his wife, with his mother, or had his own apartment.

To combat J.G.'s elusiveness, social workers continually sought to locate J.G. through, among other means: phone calls; text messages; service letters; the "parent locator;" social media platforms; government databases; jail rosters; searching local shelters; monitoring court websites; contacting his wife, parents, aunt, community corrections officer, and C.B.'s social worker; and attending one of his criminal court dates. While these efforts generally proved fruitless, there was little the Department could do to entice J.G. to meaningfully engage in services.

Substantial evidence supports the trial court's findings that the Department made active efforts to provide J.G. with remedial services and rehabilitative programs. When J.G. disengaged and evaded the Department, the Department undertook comprehensive measures in an attempt to locate J.G. so he could meaningfully engage in addressing his

No. 40426-9-III
*In re Dependency of S.S.B.*

deficiencies. The Department's actions were largely unsuccessful due to J.G.'s disengagement and purposeful unavailability to the Department. Further, providing J.G. a telephone, transportation, or housing would have proved redundant given the resources he either possessed or was being provided by the Department.

J.G. argues the Department should have assigned him a parent navigator due to his struggles with addiction, mental illness and helplessness, homelessness, and a lack of phone and transportation. Appellant's Open. Br. at 43. He asserts the concept of a parent navigator is used in many other states. *E.g.*, *Ronald H. v. Dep't of Health & Soc. Servs.*, 490 P.3d 357 (Alaska 2021). While a parent navigator might be effective in certain circumstances, we are unpersuaded a parent navigator would have been more successful in locating J.G. or assisting him with accessing service than a social worker.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Cooney, J.

WE CONCUR:

_____                    _____
Fearing, J.                                          Murphy, M.

16