COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:   Judges Elder, Petty and McCullough
Argued at Richmond, Virginia


TYRUS H. THOMPSON AND
 JA'REE C. THOMPSON


v.      Record No. 2185-12-4


FAIRFAX COUNTY DEPARTMENT OF FAMILY SERVICES,
 MINH-SANG NGUYEN,
 JASMINE VANDERPLAS AND
 STANDING ROCK SIOUX TRIBE


JASMINE VANDERPLAS                                          OPINION BY
                                               JUDGE STEPHEN R. McCULLOUGH
v.      Record No. 2216-12-4                        SEPTEMBER 10, 2013


FAIRFAX COUNTY DEPARTMENT OF FAMILY SERVICES,
 MINH-SANG NGUYEN,
 STANDING ROCK SIOUX TRIBE,
 TYRUS H. THOMPSON AND JA'REE C. THOMPSON


MINH-SANG NGUYEN


v.      Record No. 2217-12-4


FAIRFAX COUNTY DEPARTMENT OF FAMILY SERVICES


NANCY J. MARTIN, AS GUARDIAN *AD LITEM*
 FOR THE MINOR CHILD


v.      Record No. 2232-12-4


FAIRFAX COUNTY DEPARTMENT OF FAMILY SERVICES,
 MINH-SANG NGUYEN,
 JASMINE VANDERPLAS,
 STANDING ROCK SIOUX TRIBE,
 TYRUS H. THOMPSON AND JA'REE C. THOMPSON

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Randy I. Bellows, Judge

Dontaé L. Bugg (Bianchi & Bugg, PLLC, on briefs), for Jasmine
Vanderplas.

Michael S. Arif (Darlene R. Langley; Arif & Associates, on
briefs), for Minh-Sang Nguyen.

Nancy J. Martin, Guardian *ad litem* for the minor child.

Constantinos DePountis (Daniel B. Schy; Staff Attorney, Standing
Rock Sioux Tribe; Law Offices of Derek P. Richmond, on brief),
for appellee Standing Rock Sioux Tribe.

Mark D. Fiddler (Robert H. Klima; Fiddler Law Office, P.A., on
brief), for Tyrus H. Thompson and Ja'Ree C. Thompson appearing
as *amicus curiae*.

No brief or argument for appellee Fairfax County Department of
Family Services.

The Indian Child Welfare Act (ICWA) provides, with regard to a termination of parental rights case involving an Indian child not domiciled on a reservation under 25 U.S.C. § 1911(a), that state courts "shall transfer" the case to a tribal court unless the court finds "good cause to the contrary." 25 U.S.C. § 1911(b). The trial court held that the guardian *ad litem* and the foster parents of B.N., an Indian child, had not established good cause to retain jurisdiction. The court, therefore, ordered the case transferred to the Standing Rock Sioux tribal court in North Dakota. The guardian *ad litem* and the foster parents appeal this decision. For their part, B.N.'s parents appeal the order granting a stay pending appeal. For the reasons noted below, we reverse and remand for further proceedings.

BACKGROUND

Jasmine Vanderplas, also known as Jasmine Thundershield,[1] gave birth to B.N. in July 2010. Vanderplas is one-half Sioux. B.N.'s father, Minh-Sang Nguyen, is wholly of Vietnamese descent. The Standing Rock Sioux Tribe has enrolled B.N. as a member of the Tribe. The Bureau of Indian Affairs of the United States Department of the Interior issued a "Certified Degree of Indian Blood" for B.N., finding that she has a "total Sioux blood quantum [of] 1/4."

Both Vanderplas and Nguyen have abused alcohol and drugs. They also have been convicted of a number of crimes. The Fairfax County Department of Family Services initiated a variety of steps designed to protect B.N.: a preliminary protective order, a foster care placement on April 11, 2011, and, ultimately, a petition to terminate the parental rights of both parents. B.N. has not lived with either parent since April 8, 2011, when she was nine months old. It is undisputed that she has resided in Fairfax County since her birth. By orders dated May 3, 2012, the Juvenile and Domestic Relations District Court of Fairfax County (J&DR court) terminated Nguyen's and Vanderplas's residual parental rights. Nguyen and Vanderplas appealed the orders to the circuit court.

The County repeatedly sought to keep the Tribe informed of developments in the case. The Tribe participated in the April 15, 2011 hearing by telephone. On May 2, 2011, the County wrote to a representative of the Tribe, Terrance Yellow Fat, enclosed a copy of the preliminary removal order entered by the court on April 15, 2011, and informed the representative of the Tribe's right to intervene in the pending foster care proceedings. Next, on May 10, 2011, the County mailed a copy of the adjudicatory order to the tribal representative and informed him that a dispositional hearing was scheduled for June 10, 2011. As the case proceeded through the J&DR court, the County

---

[1] Throughout this opinion, we employ the surname Vanderplas, the name predominantly employed in the trial record.

continued to notify the Tribe, by registered mail, of the adjudicatory hearing, the dispositional hearing, and hearings on the Department's petitions for permanency planning. Fairfax County attempted to contact Mr. Yellow Fat by telephone and by sending him a letter by certified mail, dated April 4, 2012, informing him of the upcoming court hearing scheduled for May 3, 2012, in J&DR court. On June 19, 2012, the County mailed another certified letter to the tribal representative to inform him of the scheduled hearing for the termination of parental rights and informing him of the Tribe's right to intervene. The letter further stated that the hearing to terminate parental rights was scheduled for August 6, 2012, in the Fairfax County Circuit Court.

Initially, on August 1, 2012, the Tribe filed a motion to intervene in the J&DR court. By then, however, the case was pending in circuit court.[2] The circuit court granted the parties' motion to continue the trial date from August 6, 2012, to September 11, 2012 and again to September 12, 2012. On September 7, 2012, the Standing Rock Sioux Tribe filed a motion to intervene in the circuit court, which the court granted the same day it was filed. Relying on ICWA, the Tribe also moved on September 10, 2012, to transfer jurisdiction of the case to the Tribe's court. The Tribe is located in North Dakota, approximately 1600 miles from Fairfax County. B.N.'s parents supported the motion to transfer. Fairfax County and B.N.'s guardian *ad litem*, however, opposed the motion to transfer.

The County argued transfer was not appropriate because (1) the proceedings were at an advanced stage and the Tribe failed to promptly petition for transfer of jurisdiction; (2) the evidence necessary to decide the case could not be adequately presented in the tribal court without undue hardship to the Department and its witnesses; and (3) the transfer would harm B.N. B.N.'s guardian *ad litem* also relied on these grounds and raised two additional arguments: the Existing Indian

---

[2] The County informed the Tribe, in a letter dated August 22, 2012, of the need to intervene in the circuit court rather than in the J&DR court.

Family Exception precludes application of ICWA on these facts, and application of ICWA in this case would be unconstitutional.

The circuit court found, without objection, that B.N. is an Indian child for purposes of ICWA. The court rejected each of the grounds advanced for a finding of good cause to deny transfer. The court held that the proceedings were not at an advanced stage because the Tribe presented its motion to transfer before the *de novo* trial on the termination of parental rights. Moreover, the court noted that the parents had not been notified of their independent right to request transfer and held that they were prejudiced by this lack of notice. As to the inconvenience to the parties, the court held that modern technology, such as video conferencing, means that there would be no undue hardship for the case to proceed in North Dakota. Counsel for the Tribe stated that participation by video or telephone is "commonplace" and could be set up "with ease." The court concluded that the best interests of the child was not an appropriate consideration in determining whether to transfer the case to a tribal court. Finally, the court held that the statute was not unconstitutional on its face or as applied.

The guardian *ad litem* filed an emergency motion and a request to stay the court's order pending appeal. B.N.'s foster parents filed a motion to reconsider the trial court's transfer decision, which the guardian *ad litem* joined. In addition to the arguments previously raised, the foster parents contended that good cause existed to refuse transfer because the Fairfax County Circuit Court was the only court with jurisdiction over both parents. B.N.'s father is not a member of the Tribe and, therefore, the foster parents argued the tribal court could not adjudicate his termination of parental rights case.

The circuit court denied the motion to reconsider. After hearing testimony, the court granted the motion to stay the order to transfer, pending appeal. Regarding the stay, the court relied on testimony from a number of witnesses that it found "very, very compelling." In particular, the court

heard testimony from a psychotherapist, who testified that removing B.N. from her present environment would prove "catastrophic" due to her reactive attachment disorder. A second witness, a clinical psychologist, likewise concluded that B.N. suffered from reactive attachment disorder and that a transfer at this time would very likely cause B.N. "irreparable" harm. Finally, the trial court ruled that the foster parents would be allowed to intervene as a party for purposes of the appeal. B.N.'s foster parents desire to adopt her. B.N.'s foster parents and the guardian *ad litem* appeal the transfer decision, and her biological parents appeal the trial court's award of a stay.

ANALYSIS

Our first task is to determine the standard of review. Appellate courts in other states have employed a variety of standards in reviewing the question of whether the trial court properly found good cause to deny transfer under ICWA. Although courts have employed a variety of approaches,[3] appellate courts most commonly review transfer decisions under an abuse of discretion standard.[4]

As the commentary to the guidelines acknowledges, 44 Fed. Reg. 67,591, and as a number of courts have concluded,[5] 25 U.S.C. § 1911(b) constitutes a modified version of the

---

[3] See, e.g., Fresno Cnty. Dep't of Children & Family Servs. v. Sup. Ct, 19 Cal. Rptr. 3rd 155, 167 (Cal. Ct. App. 2004) ("[T]he substantial evidence test is a more appropriate standard [than abuse of discretion] to apply in reviewing the juvenile court's good cause determination."); Dep't of Human Servs. v. Three Affiliated Tribes of Fort Berthold Reservation (In re K.R.C.), 238 P.3d 40, 49-50 (Or. Ct. App. 2010) (employing a *de novo* standard).

[4] See In re Appeal in Maricopa Cnty. Juv. Action No. JS-8287, 828 P.2d 1245, 1248 (Ariz. Ct. App. 1991); People ex rel. A.T.W.S., 899 P.2d 223, 225, 227 (Colo. App. 1994); In re Adoption of T.R.M., 525 N.E.2d 298, 308 (Ind. 1988); In re Welfare of Children of R.M.B., 735 N.W.2d 348, 351 (Minn. Ct. App. 2007); State v. Elise M. (In re Zylena R.), 825 N.W.2d 173, 178 (Neb. 2012); In re Laurie R., 760 P.2d 1295, 1299 (N.M. Ct. App. 1988); Yavapai-Apache Tribe v. Mejia, 906 S.W.2d 152, 163, 168 (Tex. App. 1995); Dep't of Soc. & Health Servs. v. Priscilla S. (In re Dependency of E.S.), 964 P.2d 404, 408 (Wash. Ct. App. 1998).

[5] Ex parte C.L.J., 946 So. 2d 880, 887-88 (Ala. Civ. App. 2006); Chester Cnty. Dep't of Soc. Servs. v. Coleman, 399 S.E.2d 773, 775 (S.C. 1990); In re Adoption of S.S., 657 N.E.2d 935, 943 (Ill. 1995); In re C.E.H., 837 S.W.2d 947, 953-54 (Mo. Ct. App. 1992); In re Melaya F.,

forum *non conveniens* doctrine. From its inception, the forum *non conveniens* doctrine has allowed state and federal trial courts a measure of discretion in selecting an appropriate forum. See, e.g., Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 507, 511-12 (1947) (recognizing the doctrine for federal courts and applying an abuse of discretion standard). The current forum *non conveniens* statute, 28 U.S.C. § 1404, was enacted in 1948.[6] Under this statute, a district court's decision to transfer a case is also reviewed for an abuse of discretion. Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 28-29 (1988).

We conclude that an abuse of discretion standard constitutes the appropriate standard of review for transfer decisions made by trial courts under 25 U.S.C. § 1911(b). This "'standard requires a reviewing court to show enough deference to a primary decisionmaker's judgment that the court does not reverse merely because it would have come to a different result in the first instance.'" Lawlor v. Commonwealth, 285 Va. 187, 212, 738 S.E.2d 847, 861 (2013) (quoting Evans v. Eaton Corp. Long Term Disability Plan, 514 F.3d 315, 322 (4th Cir. 2008)). As the Supreme Court of Virginia has recognized, however, "the law often circumscribes the range of choice available to a court in the exercise of its discretion." Id. at 213, 738 S.E.2d at 861. Among other things, "[t]he abuse-of-discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions." Id. (citations omitted).[7]

---

810 N.W.2d 429, 434 (Neb. Ct. App. 2011); State ex rel. Human Servs. Dept. v. Wayne R.N. (In re Term. of Parental Rights of Wayne R.N.), 757 P.2d 1333, 1336 (N.M. Ct. App. 1988); People ex rel. J.J., 454 N.W.2d 317, 330 (S.D. 1990); Yavapai-Apache Tribe, 906 S.W.2d at 165-66.

[6] Act of June 25, 1948, ch. 646, 62 Stat. 937.

[7] The Tribe questions whether the Thompsons, as B.N.'s foster parents, constitute an "aggrieved party" under Code § 17.1-405. After careful consideration of the thoughtful briefs filed by the parties, we conclude that it is not necessary for us to decide the issue on these facts. Significantly, the brief of the guardian *ad litem* includes all of the assignments of error raised in the foster parents' brief. Therefore, the foster parents are not asking this Court to consider any issues beyond those raised by the guardian *ad litem*. The Thompsons have asked us to treat their briefs as amicus briefs in the event that they are not deemed proper "aggrieved parties." Whether the

# I. OVERVIEW OF ICWA

"The Indian Child Welfare Act of 1978 . . ., 92 Stat. 3069, 25 U.S.C. §§ 1901-1963, was the product of rising concern in the mid-1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes." Miss. Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 32 (1989). Congress found that "an alarmingly high percentage of Indian families [were being] broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies." 25 U.S.C. § 1901(4). Congress enacted ICWA in response to the "wholesale removal of Indian children from their homes." Holyfield, 490 U.S. at 32.

In its preliminary statement of findings, Congress expressed the importance of protecting and preserving Indian families, Indian tribes, and tribal culture, stating the following:

> (3) that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children . . . ;
>
> (4) that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions; and
>
> (5) that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families.

25 U.S.C. § 1901.

---

Thompsons appear before us as aggrieved parties or as amici would not preclude us from considering their arguments. Moreover, the case would proceed based on the appeal filed by the guardian *ad litem*. Stanley v. Fairfax DSS, 242 Va. 60, 64, 405 S.E.2d 621, 623 (1991). Therefore, rather than issue what would be akin to an advisory opinion, we assume for purposes of this appeal that the Thompsons are not aggrieved parties under Code § 17.1-405, and we consider the arguments presented in their brief as those of an amicus.

Congress declared that the policy of our Nation is

> to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture . . . .

25 U.S.C. § 1902. ICWA thus recognizes the separate tribal interest in children who are members of a tribe, or who are eligible for membership in a tribe. The term "Indian child" is defined in 25 U.S.C. § 1903(4) as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." There is no dispute that B.N. is a member of the Standing Rock Sioux Tribe, a federally recognized "Indian tribe" within the meaning of ICWA.[8]

ICWA establishes a number of procedural protections for cases involving Indian children. As relevant here, the parent or custodian of the Indian child, as well as the tribe, are entitled to notice by registered mail with return receipt requested of "any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved." 25 U.S.C. § 1912. The notice must inform the recipients of the pending proceedings and of their right to intervene. Id. The statute further provides that

> [i]f the identity or location of the parent or Indian custodian and the tribe cannot be determined, such notice shall be given to the Secretary [of the Interior] in like manner, who shall have fifteen days after receipt to provide the requisite notice to the parent or Indian custodian and the tribe. No foster care placement or

---

[8] See 25 U.S.C. § 1903(8) (defining "Indian tribe" as "any Indian tribe, band, nation, or other organized group or community of Indians recognized as eligible for the services provided to Indians by the Secretary [of the Interior] because of their status as Indians"). Federally recognized tribes are identified in the Federal Register. 25 U.S.C. § 479a; 25 U.S.C. § 479a-1. See 77 Fed. Reg. 47,868, 47,871 (Aug. 10, 2012) (listing the Standing Rock Sioux Tribe of North & South Dakota as a federally recognized tribe).

> termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe or the Secretary: *Provided*, That the parent or Indian custodian or the tribe shall, upon request, be granted up to twenty additional days to prepare for such proceeding.

Id.

We also note that ICWA contains an enforcement provision, which states that

> [a]ny Indian child who is the subject of any action for foster care placement or termination of parental rights under State law, any parent or Indian custodian from whose custody such child was removed, and the Indian child's tribe may petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated any provision of [25 U.S.C. §§ 1911, 1912, or 1913].

25 U.S.C. § 1914.[9]

If an Indian child "resides or is domiciled within the reservation of such tribe" or is a "ward of a tribal court," the child's tribe has exclusive jurisdiction "over any child custody proceeding" involving the child. 25 U.S.C. § 1911(a).[10] If an Indian child is not domiciled on or a resident of a tribal reservation, or if the child is not a ward of the tribe, the state court must

_____

[9] Additional protections afforded by ICWA in proceedings involving Indian children include the appointment of counsel, 25 U.S.C. § 1912(b); the duty to show that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family" in foster care placement or termination of parental rights proceedings, 25 U.S.C. § 1912(d); a "determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child" in foster care placement proceedings, 25 U.S.C. § 1912(e); a "determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child" in termination of parental rights proceedings, 25 U.S.C. § 1912(f); and adoptive, preadoptive, and foster care placement preferences, 25 U.S.C. § 1915.

[10] "Foster care placement" means "any action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated." 25 U.S.C. § 1903(1)(i).

transfer the case to a tribal court unless (a) either parent objects, (b) the tribal court declines the transfer, or (c) the state court makes a finding of "good cause to the contrary." 25 U.S.C. § 1911(b). The statute does not define "good cause." In addition, the tribe and any Indian custodian appointed for the child each have the right to intervene "at any point" in the "proceeding for the foster care placement of, or termination of parental rights to, an Indian child." 25 U.S.C. § 1911(c).

The Bureau of Indian Affairs (BIA) has published guidelines for interpreting and applying ICWA, with accompanying commentary, in the Federal Register. Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,584-95 (Nov. 26, 1979). These guidelines assist state courts in developing the "minimum Federal standards" for proceedings involving Indian children. 25 U.S.C. § 1902. The guidelines are "not published as regulations because they are not intended to have binding legislative effect." 44 Fed. Reg. 67,584; see also Native Village of Napaimute Traditional Council (In re Adoption of Keith M.W.), 79 P.3d 623, 626 (Alaska 2003) ("Although the [BIA] guidelines are only persuasive and are neither exclusive nor binding, 'this court has looked to them for guidance.'" (quoting In re Adoption of F.H., 851 P.2d 1361, 1364 (Alaska 1993))); Puyallup Tribe v. State (In re M.S.), 237 P.3d 161, 167 (Okla. 2010) ("Under the . . . Guidelines . . . 'good cause' is defined by a non-exclusive list."). As the guidelines themselves recognize, primary responsibility for determining the existence of good cause to deny transfer rests with state courts. 44 Fed. Reg. 67,584.

The guidelines provide that good cause to refuse transfer to a tribal court may be present in the following situations:

> (i) The proceeding was at an advanced stage when the petition to transfer was received and the petitioner did not file the petition promptly after receiving notice of the hearing.

---

"Termination of parental rights" is defined as "any action resulting in the termination of the parent-child relationship." 25 U.S.C. § 1903(1)(ii).

- 11 -

(ii) The Indian child is over twelve years of age and objects to the transfer.

(iii) The evidence necessary to decide the case could not be adequately presented in the tribal court without undue hardship to the parties or the witnesses.

(iv) The parents of a child over five years of age are not available and the child has had little or no contact with the child's tribe or members of the child's tribe.

44 Fed. Reg. 67,591, C.3(b).

The guidelines provide, in addition to the requirements specified in the statutory text, that the notice that must be given to the parents should include, among other things, "[a] statement of the right of the parents or Indian custodians or the Indian child's tribe to petition the court to transfer the proceeding to the Indian child's tribal court."  44 Fed. Reg. 67,588, B.5(b)(ix).

II.  THE EXISTING INDIAN FAMILY EXCEPTION AND THE CONSTITUTIONALITY OF ICWA

The foster parents and the guardian *ad litem* contend at the outset that ICWA is inapplicable due to the Existing Indian Family Exception.  They further contend that this exception is necessary to preserve ICWA's constitutionality.  The Kansas Supreme Court first recognized this exception in Leatherman v. Yancey (In re Adoption of Baby Boy L.), 643 P.2d 168 (Kan. 1982).  Courts recognizing this exception reason that

> because the express purpose of Congress was to prevent the culture shock and underlying emotional trauma inherent in taking children from an Indian environment and placing them in a non-Indian environment, the [Act] applies only in those situations where Indian children are being removed from an existing Indian family.

Rye v. Weasel, 934 S.W.2d 257, 261 (Ky. 1996); see also S.A. v. E.J.P., 571 So. 2d 1187, 1189-90 (Ala. Civ. App. 1990) (where the child "has never been a member of an Indian family, has never lived in an Indian home, and has never experienced the Indian social and cultural world," "[t]o apply the [Act] . . . would be contrary to the congressional intent").  Relying on a

triad of California cases,[11] foster parents and the guardian *ad litem* further contend that a failure to recognize the Existing Indian Family Exception raises doubts as to ICWA's constitutionality, and they note that statutes should be construed so as to avoid such doubts. See Eaton v. Davis, 176 Va. 330, 339, 10 S.E.2d 893, 897 (1940) ("[A] statute will be construed in such a manner as to avoid a constitutional question wherever this is possible.").

We decline to recognize the Existing Indian Family Exception for a number of reasons. First, the plain text of the statute does not recognize the application of this exception. There is no threshold requirement in the Act that the child must have been born into or must be living with an existing Indian family, or that the child must have some particular type of relationship with the tribe or his or her Indian heritage. "Because Congress has clearly delineated the nature of the relationship between an Indian child and tribe necessary to trigger application of the Act, judicial insertion of an additional criterion for applicability is plainly beyond the intent of Congress and must be rejected." In re Baby Boy C., 805 N.Y.S.2d 313, 323 (N.Y. App. Div. 2005) (citations omitted).

Second, cases recognizing the exception ignore Congress's intent "to protect the best interests of Indian children *and* to promote the stability and security of Indian tribes and families." 25 U.S.C. § 1902 (emphasis added). As the Supreme Court recognized in Holyfield, "Congress was concerned not solely about the interests of Indian children and families, but also about the impact on the tribes themselves of the large numbers of Indian children adopted by non-Indians." 490 U.S. at 49. The Existing Indian Family Exception takes an unnecessarily restrictive approach to ICWA, one that would frustrate Congress's intent to protect tribal interests.

---

[11] In re Bridget R., 49 Cal. Rptr. 2d 507 (Cal. Ct. App. 1996), In re Santos Y., 112 Cal. Rptr. 2d 692 (Cal. Ct. App. 2001), and In re Alexandria Y., 53 Cal Rptr. 2d 679 (Cal. Ct. App. 2001).

Finally, in its findings, Congress stated "that the States . . . have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families."  25 U.S.C. § 1901(5).  The Existing Indian Family Exception requires courts to assess the "Indianness" of a particular Indian child, parent, or family, a subjective determination that courts "'are ill-equipped to make.'"  Baby Boy C., 805 N.Y.S.2d at 324 (quoting In re Alicia S., 76 Cal. Rptr. 2d 121, 128 (Cal. Ct. App. 1998)).  "Since ICWA was passed, in part, to curtail state authorities from making child custody determinations based on misconceptions of Indian family life, the [Existing Indian Family] exception, which necessitates such an inquiry, clearly frustrates this purpose."  Id. (citations omitted).

We thus join the growing chorus of courts that have rejected the Existing Indian Family Exception.  See, e.g., In re Adoption of T.N.F., 781 P.2d 973, 977 (Alaska 1989); Michael J., Jr. v. Michael J., Sr., 7 P.3d 960, 963-64 (Ariz. Ct. App. 2000); In re N.B., 199 P.3d 16, 20-22 (Colo. App. 2007); Indian Tribe v. Doe (In re Baby Boy Doe), 849 P.2d 925, 927 (Idaho 1993); Tubridy v. Ironbear (In re Adoption of S.S.), 622 N.E.2d 832, 838-39 (Ill. App. Ct. 1993), rev'd on other grounds, 657 N.E.2d 935 (Ill. 1995); In re A.J.S., 204 P.3d 543, 551 (Kan. 2009) (reversing its earlier adoption of the Exception); Dep't of Soc. Servs. v. Boyd (In re Elliott), 554 N.W.2d 32, 35-36 (Mich. Ct. App. 1996); In re Adoption of Quinn, 845 P.2d 206, 209 n.2 (Or. Ct. App. 1993); Adoptive Couple v. Baby Girl, 731 S.E.2d 550, 558 n.17 (S.C. 2012), rev'd on other grounds, 133 S. Ct. 2552 (2013); In re Adoption of Baade, 462 N.W.2d 485, 489-90 (S.D. 1990); D.J.C. v. P.D.C. (State ex rel. interest of D.A.C.), 933 P.2d 993, 999-1000 (Utah Ct. App. 1997).

The guardian *ad litem* and the Thompsons contend we must recognize the Existing Indian Family Exception because, if we do not, ICWA would be subject to constitutional doubt under the Tenth Amendment.[12]  The United States Supreme Court has cautioned that although

> [s]tatutes should be construed to avoid constitutional questions . . . this interpretive canon is not a license for the judiciary to rewrite language enacted by the legislature.  Any other conclusion, while purporting to be an exercise in judicial restraint, would trench upon the legislative powers vested in Congress by Article I, § 1, of the Constitution.

Salinas v. United States, 522 U.S. 52, 60-61 (1997) (internal quotation marks and citations omitted).  A proper respect for those powers means that "[s]tatutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."  Park 'N Fly v. Dollar Park and Fly, Inc., 469 U.S. 189, 194 (1985).  We decline to rewrite ICWA to add an Existing Indian Family Exception that Congress never provided in the text of the statute.

Finally, the guardian *ad litem* contends that ICWA is unconstitutional under the Tenth Amendment.  Our Supreme Court has held that "a court will not rule upon the constitutionality of a statute unless such a determination is absolutely necessary to decide the merits of the case."  Volkswagen of Am., Inc. v. Smit, 266 Va. 444, 454, 587 S.E.2d 526, 532 (2003).  Furthermore, "[t]he fact that the present case will be remanded and that the constitutional issues may arise again does not affect our obligation to adhere strictly to this principle."  Id.  In light of our remand, it is not necessary for us to address this question.

---

[12] Mother and father again argue that the guardian *ad litem* did not preserve this argument.  As we noted above, the guardian *ad litem* joined in the motion to reconsider filed by the foster parents, a motion that included these arguments.  Therefore, the argument is properly before us.

## III. DETERMINATION OF GOOD CAUSE

A. The party opposing transfer must establish good cause by clear and convincing evidence.

Before turning to the merits of what constitutes good cause to retain the case in state court, we must first determine the burden of proof a litigant must shoulder in order to establish good cause. There is no dispute that the burden to prove good cause falls on the party opposing tribal jurisdiction. According to the guidelines, "[t]he burden of establishing good cause to the contrary shall be on the party opposing the transfer." 44 Fed. Reg. 67, 591, C.3(d); see also People ex rel. T.I., 707 N.W.2d 826, 834 (S.D. 2005); Hoots v. K.B. (In re Interest of A.B.), 663 N.W.2d 625, 631 (N.D. 2003).

ICWA does not specify the quantum of proof that a party opposing transfer must shoulder. The consensus view among the states is that "good cause" under ICWA must be shown by clear and convincing evidence. People ex rel. J.L.P., 870 P.2d 1252, 1257 (Colo. Ct. App. 1994); In re Adoption of T.R.M., 525 N.E.2d 298, 308, 314 (Ind. 1988); In re Interest of A.P., 961 P.2d 706, 713 (Kan. Ct. App. 1998); In re M.E.M., 635 P.2d 1313, 1317 (Mont. 1981); Puyallup Tribe, 237 P.3d at 167; People ex rel. T.I., 707 N.W.2d at 834; Dep't of Soc. & Health Servs. v. Priscilla S. (In re Dependency of E.S.), 964 P.2d 404, 408 (Wash. Ct. App. 1998). Like the clear and convincing burden of proof that protects a parent's rights in a termination of parental rights proceeding, Code § 16.1-283(C), a clear and convincing standard in this context protects the tribal interests that lie at the heart of ICWA. Cf. Native Village of Tununak v. Dep't of Health & Soc. Servs., 303 P.3d 431 (Alaska 2013) (discussing clear and convincing standard in the context of adoption preferences under ICWA). Therefore, we hold that a party who seeks to deny transfer bears the burden of proving good cause by clear and convincing evidence.

B.  The tribal court has jurisdiction over both parents.

The guardian *ad litem* and the foster parents argue that the case must be retained in the Fairfax County Circuit Court because that is the only court with jurisdiction over both parents. They argue that the tribal court lacks jurisdiction over father because he is not a member of the Tribe, whereas the circuit court has jurisdiction over both mother and father.  Whether the tribal court could exercise jurisdiction over father is a legal question.[13]  We review such questions *de novo*.  See, e.g., Wilby v. Gostel, 265 Va. 437, 440, 578 S.E.2d 796, 797 (2003).

As the guardian *ad litem* and the foster parents note, tribal courts have limited *inherent authority* to adjudicate disputes involving non-members, see Montana v. United States, 450 U.S. 544, 565 (1981).  Here, however, we are not dealing with a claim of inherent authority but rather with jurisdiction expressly conferred by Congress.  The text of ICWA is plain that tribal courts have jurisdiction to adjudicate termination of parental rights cases involving an Indian child.  25 U.S.C. § 1911(b).  ICWA further defines "parent" to include "any biological parent or parents of an Indian child," without reference to that biological parent's race or ethnicity.  25 U.S.C. § 1903(9).[14]  The statute does not limit tribal court jurisdiction to cases where both parents are Indian.  Id.  It applies to parents of Indian children across the board.  The absence of an express mention of non-Indian parents does not alter the plain language reading of the statute.  See Jimenez v. Quarterman, 555 U.S. 113, 118 (2009) ("[W]hen the statutory language is plain, we must enforce it according to its terms.").  Furthermore, a non-Indian parent who objects to tribal

---

[13] Mother and father argue that the guardian *ad litem* did not preserve this argument.  The foster parents made the argument in their motion to reconsider and in the accompanying memorandum in opposition to the Tribe's motion to transfer.  The trial court's final order reflects that the guardian *ad litem* joined in this motion.  Therefore, we conclude that the guardian *ad litem* has preserved these arguments.

[14] This definition includes an exception, not applicable here, for "the unwed father where paternity has not been acknowledged or established."  25 U.S.C. § 1903(9).

- 17 -

court jurisdiction can defeat that jurisdiction by the simple expedient of filing an objection. 25 U.S.C. § 1911(b). In addition, father expressly has consented to the case being heard in the tribal court. There is no question that the tribal court can exercise both subject matter and personal jurisdiction over father, both by virtue of his consent and under the plain text of the statute.

In support of their argument, the guardian *ad litem* and the Thompsons cite In re Welfare of the Child of R.S., 805 N.W.2d 44 (Minn. 2011). The issue before the court in that case was whether Congress intended to permit transfer of adoptive and pre-adoptive placement proceedings to tribal courts. Id. at 50-51. The court first noted that because neither the child nor the child's parents resided on the tribal reservation, the tribal court lacked *inherent* jurisdiction over the termination of parental rights proceedings involving the child. Id. at 50. The court found that "the tribal court could assume jurisdiction over the proceeding, if at all, only by Congressional grant." Id. Turning to the text of ICWA, and specifically 25 U.S.C. § 1911(b), the court noted that Congress explicitly granted tribal courts jurisdiction over "foster care placement" and "termination of parental rights" proceedings, while neglecting to mention child custody proceedings, which "*include*[] preadoptive and adoptive proceedings." Id. at 51. Since Congress specifically used the term "child custody proceeding" in 25 U.S.C. § 1911(a), the court concluded that the term's absence in subsection (b) must have been the result of an intentional choice made by Congress. Id. This "persuaded [the court] that Congress did not intend to permit the transfer of adoptive and preadoptive placement proceedings to tribal courts." Id. at 50-51. Thus, the decision in R.S. does not support the argument that the tribal court lacks jurisdiction to terminate father's parental rights.

People ex rel. T.I., 707 N.W.2d 826, also cited by the guardian *ad litem*, likewise does not support her argument. Two tribes were involved in that case, the Sisseton-Wahpeton Sioux Tribe and the Yankton Sioux Tribe. One of the two children involved was enrolled in the

- 18 -

Yankton Sioux Tribe. The only tribe requesting transfer, however, was the Sisseton-Wahpeton Sioux Tribe. The South Dakota Supreme Court upheld the trial court's finding of good cause, reasoning that the only tribe asking for transfer did not have jurisdiction over a non-member, whereas the state court was the only court with jurisdiction over both children. In addition, experts had recommended that the children remain together. Id. at 835. Those facts simply bear no resemblance to the case before us.

C. The role of the best interests of the child

The Thompsons and the guardian *ad litem* argue that B.N.'s best interests can establish good cause not to transfer. The Tribe argues that a child's best interests are irrelevant in determining which court has jurisdiction to decide those best interests.

This question has sharply divided the lower courts. A number of courts have accepted a child's best interests as a factor that is relevant to the good cause inquiry. See In re Appeal in Maricopa Cnty. Juv. Action No. JS-8287, 828 P.2d 1245, 1251 (Ariz. Ct. App. 1981) ("A trial court properly may consider an Indian child's best interests when deciding whether to transfer a custody proceeding to tribal court."); Weigle v. Devon T. (In re Robert T.), 246 Cal. Rptr. 168, 175 (Cal. Ct. App. 1988) (holding that the best interests of the child is a "pertinent and indeed a necessary consideration in deciding whether to grant or deny a transfer request"); In re Adoption of T.R.M., 525 N.E.2d at 307-08 (concluding that the best interests of a child is a valid consideration in determining whether to transfer a child custody proceeding to tribal court); In re T.S., 801 P.2d 77, 80-81 (Mont. 1990) (same); Carney v. Moore (In re N.L.), 754 P.2d 863, 869 (Okla. 1988) (same); In re J.L., 654 N.W.2d 786, 792-93 (S.D. 2002) (same). These courts generally reason that, in enacting ICWA, Congress had the best interests of Indian children in mind and courts should not ignore those interests when deciding whether to transfer a case.

Many courts, however, conclude that a best interests analysis is inappropriate when the issue before the court is whether to transfer the case. These courts reject as irrelevant any inquiry into the child's best interests in making the transfer decision. They also reason that, by providing tribal courts with presumptive jurisdiction, Congress presumed that these courts would consider a child's best interests in adjudicating a termination of parental rights case. People ex rel. J.L.P., 870 P.2d at 1258-59 (holding that the best interests of the child are not relevant in determining whether to transfer child custody proceedings to a tribal court); In re Armell, 550 N.E.2d 1060, 1065 (Ill. App. Ct. 1990) (same); T.W. v. L.M.W. (In re C.E.H.), 837 S.W.2d 947, 954 (Mo. Ct. App. 1992) (same); State v. Elise M. (In re Zylena R.), 825 N.W.2d 173, 184-86 (Neb. 2012) (overruling prior cases and holding that a child's best interests "should not be a factor in resolving the issue of whether there is good cause to deny a motion to transfer a case involving an Indian child from state court to tribal court"); In re Guardianship of Ashley Elizabeth R., 863 P.2d 451, 456 (N.M. Ct. App. 1993) (holding the best interests of the child irrelevant to transfer decision); Hoots, 663 N.W.2d at 633-34 (same); Yavapai-Apache Tribe v. Mejia, 906 S.W.2d 152, 168-71 (Tex. App. 1995) (reviewing conflicting authority and concluding that a child's best interests is not relevant to the transfer decision).

We conclude that the traditional best interest of the child analysis is too broad a consideration in deciding whether good cause exists to retain jurisdiction. Rather, we hold that the sole focus under this aspect of the good cause analysis should be on the immediate effect a transfer of jurisdiction would have on the well-being of the child. Thus we conclude that the appropriate test is whether the transfer of jurisdiction itself would cause, or would present a substantial risk of causing immediate, serious emotional or physical damage to the child. We reach this conclusion for several reasons. First, Congress plainly stated that one of the purposes of ICWA was, along with protecting tribal interests, "to protect the best interests of Indian children." 25 U.S.C. § 1902. This

overriding purpose of ICWA cannot be ignored altogether in making the transfer decision.  Second, in the analogous context of ruling on forum *non conveniens* motions or change of venue motions, courts have considered whether the forum chosen by the plaintiff would be oppressive and vexatious to the defendant, or whether the "plaintiff's chosen forum imposes a heavy burden on the defendant or the court, and where the plaintiff is unable to offer any specific reasons of convenience supporting his choice."  Piper Aircraft Co. v. Reyno, 454 U.S. 235, 249 (1981).  These considerations have led courts to consider the health of the defendant in determining a proper forum.[15]  Although the resolution of a transfer under ICWA differs from a ruling on a motion for a change of venue or a forum *non conveniens* motion, the standards employed in ruling on those motions inform our analysis of the proper forum under ICWA.  Therefore, we hold that good cause exists under 25 U.S.C. § 1911(b) if the party opposing the transfer can establish by clear and convincing evidence that transferring the case to a tribal court would cause, or would present a substantial risk of causing, immediate serious emotional or physical damage to the child.[16]

---

[15] Schexnider v. McDermott Int'l, Inc., 817 F.2d 1159, 1163 (5th Cir. 1987) (declining to transfer the case because, among other factors, plaintiff, an American seaman in poor health, would be greatly inconvenienced by suit in Australia, and therefore the United States constituted the proper forum); Elemary v. Philipp Holzmann A.G., 533 F. Supp. 2d 144, 153 (D.D.C. 2008) ("A moving party's medical disability can support a motion to transfer venue . . . ."); Hand v. Liberty Life Assurance Co. of Boston, No. 07 C 1422, 2008 U.S. Dist. LEXIS 26501, at *6-7 (N.D. Ill. Mar. 31, 2008) (transferring a case pursuant to 28 U.S.C. § 1404(a), in part because the defendant was elderly and suffered from serious health problems, and there was no countervailing difficulty for the plaintiff); Sassy, Inc. v. Berry, 406 F. Supp. 2d 874, 876-77 (N.D. Ill. 2005) (transferring case pursuant to 28 U.S.C. § 1404(a), in part because the defendant suffered from health problems and was advised by his physician not to travel); BSB Bank & Trust Co. v. Morrison, No. 02-CV-648, 2003 U.S. Dist. LEXIS 5408, at *5-7 (N.D.N.Y. Apr. 4, 2003) (transferring a case under 28 U.S.C. § 1404(a), despite a forum selection clause, because the significant medical problems of the defendants constituted exceptional circumstances).

[16] Transferring a young child to a new setting inevitably will cause some disruption and not infrequently some modicum of harm to the child.  That bare showing, without more, however, cannot be sufficient to defeat transfer to a tribal court.

The focus in a transfer decision under 25 U.S.C. § 1911(b) must remain on the immediate serious emotional or physical damage flowing *from the transfer itself*. This inquiry is not the same as a determination of a child's best interests in a proceeding to terminate parental rights. The statutory structure makes clear Congress's presumption that, in the event of a transfer, tribal courts are fully competent to consider the child's best interests in adjudicating the termination of parental rights proceeding. Thus, ICWA presumes jurisdiction rests with the tribe, and the transfer inquiry must center on whether a compelling reason exists *not* to transfer the case, based in part on the immediate effect of a transfer of jurisdiction on the child.

A relevant consideration in this regard is whether the Tribe is willing to allow the child to stay in her current environment, pending adjudication of the case on the merits of termination and/or placement. When the "serious emotional or physical damage" aspect of the good cause determination becomes an issue, good cause to deny transfer does not exist if the tribe agrees to maintain the status quo until it completes its adjudication on the merits. Only if the tribe does not agree or fails to present evidence of its agreement to preserve the status quo does good cause exist not to transfer.

The trial court held that harm to the child was not relevant in adjudicating a transfer decision under ICWA. For the reasons noted above, we reach a contrary conclusion. This error of law compels us to reverse and remand for a determination of whether clear and convincing evidence establishes a transfer would cause, or would present a substantial risk of causing, immediate serious emotional or physical damage to B.N. If the answer is in the affirmative and the Tribe fails to present evidence establishing it will maintain the status quo in the child's placement pending adjudication of the underlying issues, good cause exists to retain the case in state court.[17]

---

[17] We recognize that the trial court made a determination, in granting a stay pending appeal, that the child would be gravely injured by a transfer of the case to the tribal court. Nevertheless, a remand is appropriate for several reasons. First, the burden of proof for a finding of good cause is

Otherwise, we must apply the statutory presumption that the tribal court is in the best position to determine what outcome will achieve an appropriate balance between ICWA's dual goals of "protect[ing] the best interests of Indian children" while also "promot[ing] the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture." 25 U.S.C. § 1902.

### D. The proceedings were not at an advanced stage.

The guardian *ad litem* and the foster parents argue that the case was at an advanced stage and, therefore, good cause was present to retain the case in state court. The guidelines provide that good cause may exist when "[t]he proceeding was at an advanced stage when the petition to transfer was received and the petitioner did not file the petition promptly after receiving notice of the hearing." 44 Fed. Reg. 67,591. The commentary to the guidelines states that "requests [to transfer the case] are to be made promptly after receiving notice of the proceeding" and that

> [w]hen a party who could have petitioned earlier waits until the case is almost complete to ask that it be transferred to another court and retried, good cause exists to deny the request.
>
> Timeliness is a proven weapon of the courts against disruption caused by negligence or obstructionist tactics on the part of counsel. If a transfer petition must be honored at any point before judgment, a party could wait to see how the trial is going in state court and then obtain another trial if it appears the other side will win. . . . The Act was not intended to authorize such tactics and the

by clear and convincing evidence, which represents a higher quantum of proof than what is required to obtain a stay. Second, the purpose of a stay pending appeal "is to preserve the *status quo* pending appellate determination," McClendon v. City of Albuquerque, 79 F.3d 1014, 1020 (10th Cir. 1996), whereas the purpose of the good cause finding is to determine whether to transfer or keep a case involving an Indian child. Third, a wide range of considerations come into play in determining whether to grant a stay. See Hilton v. Braunskill, 481 U.S. 770, 774-78 (1987). In contrast, the good cause inquiry here is much more focused and turns on a determination of whether transferring the child to a tribal court would cause, or would present a substantial risk of causing, serious emotional or physical damage to the child. Finally, parties generally will make different tactical choices in litigating a motion to stay than they would make in litigating the question of good cause to deny transfer.

> "good cause" provision is ample authority for the court to prevent
> them.

44 Fed. Reg. 67,590, C.1. cmt.

Applying this aspect of good cause, some courts have held that a transfer motion filed after the final disposition of the case is not timely. See People ex rel. S.G.V.E., 634 N.W.2d 88, 93 (S.D. 2001); In re A.P., 962 P.2d 1186, 1190-91 (Mont. 1998). Another court found that a motion to transfer filed on the day of trial or during trial was untimely, and, therefore, good cause was present to deny the transfer. See State ex rel. Human Servs. Dep't v. Wayne R.N. (In re Term. of Parental Rights of Wayne R.N.), 757 P.2d 1333, 1335-36 (N.M. Ct. App. 1988) (holding that a motion to transfer made orally on the morning of trial, six months after the tribe was given notice of the proceedings, was one of the factors weighing in favor of finding good cause to deny transfer). Whether a proceeding is at an advanced stage is not susceptible to bright line rules. See In re Welfare of Child of T.T.B. & G.W., 724 N.W.2d 300, 307-08 (Minn. 2006) (holding the proceeding was at an advanced stage because various steps required by Minnesota law had already taken place and the trial had previously been postponed).

We first conclude that a failure to seek transfer at the earliest opportunity does not constitute an unreasonable delay by the Tribe. ICWA allows tribes to seek the transfer to a tribal court in two kinds of proceedings: "foster care placement" and "termination of parental rights." 25 U.S.C. § 1911(b). The foster parents argue that "Congress intended to grant tribes the right to request transfer of a single proceeding – whichever one takes place first." We disagree. First, a plain reading of 25 U.S.C. § 1911(b) allows the Tribe to intervene in *either* a foster care placement or a termination of parental rights case, *or both*. The terms "foster care placement" and "termination of parental rights" are separately defined under ICWA. 25 U.S.C. § 1903(1). To conflate the two "would subsume an Indian tribe's right to request transfer of a termination proceeding into its right to request transfer of an earlier foster care placement proceeding." Hoots, 663 N.W.2d at 632; see

also Elise M., 825 N.W.2d at 182 ("The State's argument that a foster care placement proceeding and a termination of parental rights proceeding are a single 'proceeding' for purposes of the 'advanced stage' analysis is inconsistent with the plain language of ICWA . . ., which defines them as separate proceedings.").

Second, a foster care placement differs materially from a termination of parental rights case. "[A] foster care placement proceeding seeks to temporarily remove an Indian child from the child's parent or Indian custodian without terminating parental rights, while a termination of parental rights proceeding seeks to end the parent-child relationship." Hoots, 663 N.W.2d at 632. In Virginia, when a child is initially removed from her parents' care, the default goal ordinarily is to reunite the child with his or her parents. See Code §§ 16.1-281 to -283. A termination of parental rights proceeding is a far more drastic step and implicates the tribe's interest in a much more significant way. As the Supreme Court of Nebraska observed,

> a Tribe may have no reason to seek transfer of a foster placement proceeding where it agrees with the Indian child's placement and the permanency goal is reunification with the parents. However, once the goal becomes termination of parental rights, a Tribe has a strong cultural interest in seeking transfer of that proceeding to tribal court.

Elise M., 825 N.W.2d at 183. The Thompsons' reading of the statute would effectively force the tribe to intervene in every foster care placement or risk forfeiting their interests. This would needlessly complicate foster care placement hearings and cause a significant and often unnecessary expenditure of scarce tribal resources.

The Thompsons and the guardian *ad litem* also argue that the circuit court should have considered harm to the child in determining whether the proceedings were at an advanced stage. They point out that an earlier intervention by the Tribe would have prevented further attachment between B.N. and her foster care family and would have reduced the harm she may suffer should she be removed from her foster care family. This argument invites us to reintroduce a best interests

- 25 -

analysis in determining whether the proceedings are at an advanced stage. We addressed above the best interests analysis with regard to transfers under 25 U.S.C. § 1911(b). Accordingly, we decline to address that issue anew in the context of determining whether the proceedings are at an advanced stage.

The Thompsons and the guardian *ad litem* also argue that the trial court should not have considered the lack of notice to the parents of their right to transfer the case to a tribal court. The guidelines, but not the statute, provide that parents should be provided with notice, "written in clear and understandable language . . . [which] include[s] the following information: . . . [a] statement of the right of the parents or Indian custodians or the Indian child's tribe to petition the court to transfer the proceeding to the Indian child's tribal court." 44 Fed. Reg. 67,588, B.5(b)(ix). The circuit court indicated that its decision was influenced by the fact that the parents were not provided with this notice. The parents' lack of notice does not influence our review of good cause for two reasons. First, the text of ICWA does not require this notice. Although the guidelines provide for such notice, the guidelines are advisory only. Second, the parents were represented by counsel. Counsel for mother and father were aware that B.N. was or may be an Indian child. Therefore, counsel could readily have investigated the parents' rights under ICWA.

Instead, our resolution of this question is focused on the plain understanding that the commencement of a *de novo* trial in circuit court to terminate parental rights is not an advanced stage. While the appeal to circuit court does not automatically suspend the judgment of the J&DR court under Code § 16.1-298, that does not alter the fact that the parties were standing on the threshold of a *de novo* proceeding when the Tribe moved to transfer the case. The fact that Virginia grants *de novo* review in circuit court to a judgment of a J&DR court terminating a parent's residual parental rights means that the J&DR court proceeding *and* the circuit court proceeding each constitute a proceeding to terminate parental rights within the intendment of ICWA. Moreover,

pursuing an appeal that the law entitles a party to file hardly constitutes obstructionist tactics, gamesmanship, or forum shopping.

Finally, the Tribe did not act with undue delay. The Tribe intervened promptly enough after being notified of the pending termination of parental rights proceeding in circuit court: as required by ICWA, the Tribe was notified by registered letter on June 19, 2012, signed for by a tribal representative on July 5, 2012, of the *de novo* trial in the circuit court; the Tribe moved to intervene, albeit in the wrong court, on August 1, 2012. This signaled to the parties that the Tribe intended to intervene, and the County promptly sought a continuance to accommodate the Tribe. The Tribe filed its motion to intervene in the correct court on September 7, 2012. Moreover, there is no indication that the delay in the intervention by the Tribe, which occurred before the *de novo* trial had commenced, caused any prejudice to the parties. For all of these reasons, we conclude that the trial court correctly concluded that the proceeding was not at an advanced stage and, therefore, good cause did not exist on this basis to deny transfer to the tribal court.

## E. Hardship to the parties

The Thompsons and the guardian *ad litem* contend that good cause exists because transferring the case to the tribal court in North Dakota would cause undue hardship to the parties and to the witnesses. The guidelines recognize such hardship as a basis for good cause, providing that "[g]ood cause not to transfer the proceeding may exist if . . . [t]he evidence necessary to decide the case could not be adequately presented in the tribal court without undue hardship to the parties or the witnesses." 44 Fed. Reg. 67,591, C.3(a)(iii). The commentary, written in 1979, notes that "[a]pplication of this criterion will tend to limit transfers to cases involving Indian children who do not live very far from the reservation. This problem may be alleviated in some instances by having the court come to the witnesses." 44 Fed. Reg. 67,591, C.3 cmt.

The foster parents and the guardian *ad litem* point out that all or at least the vast majority of the witnesses are located in Fairfax County.  The Tribe is located in North Dakota, 1600 miles away.  The trial court reasoned that modern technology, audio visual communication, and hearings by telephone, will allow the tribal court to hear the evidence without undue hardship.

The guardian *ad litem* notes that the Tribe did not employ audio visual technology in this case, but rather appeared by telephone.  She also argues that the telephone connection with the Tribe was poor.  However, the record reveals that the tribal attorney was able to satisfactorily present argument.  The only problem the record reveals is that on several occasions the attorney for the Tribe had difficulty hearing, and he was once disconnected.  This problem was easily solved.  Counsel for the Tribe represented to the court that participation by video or by telephone is "commonplace" and could be set up "with ease."  The trial court accepted and relied upon this representation from counsel.  Based on the representation of counsel for the Tribe concerning the availability of telephonic or audio visual communication, we discern no undue hardship for the parties or the witnesses in presenting their testimony by such means.

More compellingly, the guardian *ad litem* argues that the necessary witnesses cannot be compelled to testify by subpoena and "[t]o say all nine [witnesses designated by the County] would voluntarily make themselves available is not realistic."  The burden of proving good cause rests with the party opposing the transfer.  The absence of extraterritorial subpoena power could establish good cause in the appropriate case – a forum is not appropriate if the evidence cannot or will not be presented there.[18]  The record here, however, fails to indicate that the relevant witnesses would not

---

[18] Like the States, whose authority is circumscribed, subject to limited exceptions, to the borders of each particular State, Indian tribes have limited power to issue subpoenas for witnesses who are beyond the borders of the tribe's reservation.  See N.D. Op. Att'y Gen. 99-F-12 (1999) (concluding that the tribe has no extraterritorial subpoena authority over North Dakota employees of the North Dakota Department of Human Services), available at http://www.ag.state.nd.us/opinions/1999/Formal/9912.pdf (ND official opinions).  See generally Rhonda Wasserman, The Subpoena Power: Pennoyer's Last Vestige, 74 Minn. L. Rev. 37, 39

or would be unlikely to participate by telephone or via audio visual communication.[19]  As to documents, there is no reason to believe the Tribe would not have access to relevant documents that are a matter of public record.  Therefore, the evidence supports the trial court's ruling declining to find good cause on this ground.

CONCLUSION

We reverse and remand for further proceedings to determine whether, by clear and convincing evidence, the transfer to a tribal court would cause, or would present a substantial risk of causing, immediate serious emotional or physical damage to B.N., and we reverse the award of custody of B.N. to the Tribe.[20]

Reversed and remanded.

---

(1989) (discussing territorial limits on a state's subpoena authority).  In addition, it is not clear to what extent the Uniform Interstate Depositions and Discovery Act (UIDDA), as codified at Code § 8.01-412.8 to -412.15, applies to a tribe.

[19] Given that the bulk of the Virginia witnesses appear to favor a retention of custody by foster parents, with or without a termination of parental rights, the evidence actually tends to indicate those witnesses are likely to participate willingly or based upon payment of their expert witness fees.

[20] The Tribe and B.N.'s natural parents argue that the trial court erred in issuing a stay. Our remand makes this question moot.  In the absence of an argument that this is a question that is capable of repetition yet evading review, we do not address the point.